**EXHIBIT PTF-2**

# 2023 · 11-07 | Netflix US Patent 11,810,254

## EXHIBIT PTF-2



US011810254B2

(12) **United States Patent**      (10) Patent No.:     **US 11,810,254 B2**
Trojansky                          (45) Date of Patent:         **Nov. 7, 2023**

(54) **DISPLAYING A SCENE TO A SUBJECT WHILE CAPTURING THE SUBJECT'S ACTING PERFORMANCE USING MULTIPLE SENSORS**

(71) Applicant: **Netflix, Inc.**, Los Gatos, CA (US)

(72) Inventor: **Stephan Trojansky**, Los Angeles, CA (US)

(73) Assignee: **Netflix, Inc.**, Los Gatos, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **17/709,126**

(22) Filed: **Mar. 30, 2022**

(65) **Prior Publication Data**
US 2022/0319115 A1     Oct. 6, 2022

**Related U.S. Application Data**

(60) Provisional application No. 63/168,558, filed on Mar. 31, 2021.

(51) **Int. Cl.**
*G06T 17/20*      (2006.01)
*G06T 7/73*       (2017.01)
*G06T 1/00*       (2006.01)
*B25J 19/02*      (2006.01)
*G06T 15/04*      (2011.01)

(52) **U.S. Cl.**
CPC ............. *G06T 17/20* (2013.01); *B25J 19/021* (2013.01); *G06T 1/0014* (2013.01); *G06T 7/74* (2017.01); *G06T 15/04* (2013.01)

(58) **Field of Classification Search**
CPC ......... G06T 17/20; G06T 7/74; G06T 1/0014; G06T 15/04; B25J 19/021
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 11,577,177 B2 † | 2/2023 | Guertin |
| 2013/0181901 A1* | 7/2013 | West .................... H04N 9/3147 345/1.3 |
| 2015/0055101 A1* | 2/2015 | Kim ..................... H04N 9/3147 353/94 |
| 2018/0059528 A1* | 3/2018 | Gocke ................. H04N 9/3147 |
| 2022/0319115 A1* | 10/2022 | Trojansky ............ B25J 19/021 |

OTHER PUBLICATIONS

Enrico Calabrese†, DHP19: Dynamic Vision Sensor 3D Human Pose Dataset, 2019, pp. 1-10.*
PCT/US2022/035002 International Search Report and Written Opinion dated Oct. 10, 2022.

* cited by examiner
† cited by third party

*Primary Examiner* — Abderrahim Merouan
(74) *Attorney, Agent, or Firm* — Greenberg Traurig, LLP

(57)     **ABSTRACT**

A system surrounds an area with a first set of display panels. A second set of display panels is positioned above the area, and a third set of display panels is positioned below the area. A subject is positioned within the area and may be on an omnidirectional treadmill within the area. A controller communicates content to the first set of display panels, the second set of display panels, and the third set of display panels that presents a multidimensional scene when displayed. A set of sensors capture sensor data of the subject within the area while content is displayed. One or more of the sensors may be coupled to a repositioning system that repositions sensors so the subject remains in a field of view of different sensors. From sensor data of the subject, a representation of the subject may be generated for insertion into other video content.

**19 Claims, 8 Drawing Sheets**



Url 1: link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
Url 2: MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
Url 3: Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
Url 4: drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

**EXHIBIT PTF-2 | p. 1**

# 2023 · 11-07 | Netflix US Patent 11,810,254

## EXHIBIT PTF-2

2023-11-07__US11810254.pdf

SHA-256 Hash of Source File: e3099a29ef312678ece15c37ecd16e0d038c9488564a384f129b294b843f5df3

Page: 2 of 20      [ source file ]      [ .ots timestamp of source file ]      [ metadata ]



**U.S. Patent**     **Nov. 7, 2023**     **Sheet 1 of 8**     **US 11,810,254 B2**

FIG. 1

FIG. 2

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

## 2023 · 11-07 | Netflix US Patent 11,810,254

EXHIBIT PTF-2

2023-11-07__US11810254.pdf

SHA-256 Hash of Source File:  e3099a29ef312678ece15c37ecd16e0d038c9488564a384f129b294b843f5df3

Page: 3 of 20      [ source file ]      [ .ots timestamp of source file ]      [ metadata ]

U.S. Patent          Nov. 7, 2023          Sheet 2 of 8          US 11,810,254 B2



FIG. 3

Url 1: link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
Url 2: MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
Url 3: Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
Url 4: drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 3

## 2023 · 11-07 | Netflix US Patent 11,810,254
EXHIBIT PTF-2

2023-11-07__US11810254.pdf

SHA-256 Hash of Source File:  e3099a29ef312678ece15c37ecd16e0d038c9488564a384f129b294b843f5df3

Page: 4 of 20       [ source file ]       [ .ots timestamp of source file ]       [ metadata ]



**U.S. Patent**     Nov. 7, 2023      Sheet 3 of 8        US 11,810,254 B2

FIG. 4

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 4

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

# 2023 · 11-07 | Netflix US Patent 11,810,254
## EXHIBIT PTF-2

2023-11-07__US11810254.pdf

SHA-256 Hash of Source File:  e3099a29ef312678ece15c37ecd16e0d038c9488564a384f129b294b843f5df3

Page: 5 of 20       [ source file ]       [ .ots timestamp of source file ]       [ metadata ]



**U.S. Patent**     **Nov. 7, 2023**     **Sheet 4 of 8**     **US 11,810,254 B2**

Display Content to a Subject in an Area by Display Panels Surrounding the Area
505

Capture Sensor Data of Acting Performance of Subject Using Set of Sensors While Content is Displayed to Subject
510

Generate Three-Dimensional Representation of Subject and Texture Image from Captured Sensor Data
515

Insert Three-Dimensional Representation of Subject into Target Scene
520

Generate Final Content by Rendering Three-Dimensional Representation of Subject in Target Scene
525

FIG. 5

Url 1: link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
Url 2: MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
Url 3: Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
Url 4: drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

**EXHIBIT PTF-2 | p. 5**

# 2023 · 11-07 | Netflix US Patent 11,810,254

EXHIBIT PTF-2

2023-11-07__US11810254.pdf

SHA-256 Hash of Source File:  e3099a29ef312678ece15c37ecd16e0d038c9488564a384f129b294b843f5df3

Page: 6 of 20      [ source file ]      [ .ots timestamp of source file ]      [ metadata ]

U.S. Patent          Nov. 7, 2023          Sheet 5 of 8          US 11,810,254 B2



FIG. 6

Url 1: link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
Url 2: MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
Url 3: Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
Url 4: drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 6

# 2023 · 11-07 | Netflix US Patent 11,810,254

EXHIBIT PTF-2

2023-11-07__US11810254.pdf

SHA-256 Hash of Source File: e3099a29ef312678ece15c37ecd16e0d038c9488564a384f129b294b843f5df3

Page: 7 of 20     [ source file ]     [ .ots timestamp of source file ]     [ metadata ]

**U.S. Patent**     **Nov. 7, 2023**     **Sheet 6 of 8**     **US 11,810,254 B2**



FIG. 7

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

# 2023 · 11-07 | Netflix US Patent 11,810,254

EXHIBIT PTF-2

2023-11-07__US11810254.pdf

SHA-256 Hash of Source File:  e3099a29ef312678ece15c37ecd16e0d038c9488564a384f129b294b843f5df3

Page: 8 of 20      [ source file ]      [ .ots timestamp of source file ]      [ metadata ]

U.S. Patent          Nov. 7, 2023          Sheet 7 of 8          US 11,810,254 B2



FIG. 8

Url 1: link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
Url 2: MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
Url 3: Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
Url 4: drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 8

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

## 2023 · 11-07 | Netflix US Patent 11,810,254

EXHIBIT PTF-2

2023-11-07__US11810254.pdf

SHA-256 Hash of Source File:  e3099a29ef312678ece15c37ecd16e0d038c9488564a384f129b294b843f5df3

Page: 9 of 20      [ source file ]      [ .ots timestamp of source file ]      [ metadata ]

**U.S. Patent**      **Nov. 7, 2023**      **Sheet 8 of 8**      **US 11,810,254 B2**



900

905A      905B      905C      905D

FIG. 9

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 9

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

# 2023 · 11-07 | Netflix US Patent 11,810,254

## EXHIBIT PTF-2

2023-11-07__US11810254.pdf

SHA-256 Hash of Source File:  e3099a29ef312678ece15c37ecd16e0d038c9488564a384f129b294b843f5df3

Page: 10 of 20      [ source file ]      [ .ots timestamp of source file ]      [ metadata ]

US 11,810,254 B2

**1**

### DISPLAYING A SCENE TO A SUBJECT WHILE CAPTURING THE SUBJECT'S ACTING PERFORMANCE USING MULTIPLE SENSORS

#### CROSS REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. Provisional Application No. 63/168,558, filed Mar. 31, 2021, which is incorporated by reference in its entirety.

#### BACKGROUND

This invention relates generally to enabling digital acting performance, and more specifically to a system for displaying a dynamic, multidimensional scene to a subject while capturing the subject's acting performance using multiple sensors, such as cameras.

An increasing number of safety measures have been implemented for filming. These have increased complexity and cost for capturing content, such as video for presentation to subjects. For example, maintaining increased distance between actors and other personnel has limited the number of actors or other personnel capable of being on site for capturing video or other content, increasing times and complexity for capturing video including multiple actors. Further, other precautions to provide more sanitary environments have increased overall costs for capturing video.

#### SUMMARY

A system at least partially surrounds an area with a first set of display panels. In some embodiments, the first set of display panels surrounds the area in 360 degrees, though the first set of display panels may have an opening to allow a subject to enter and exit the system. A second set of display panels is positioned above the area (e.g., on a ceiling), and a third set of display panels may be positioned below the area (e.g., on a floor). In some embodiments, an omnidirectional treadmill is included within the area, with the second set of display panels and the third set of display panels positioned relative to the omnidirectional treadmill.

A controller communicates content to the first, second, and third sets of display panels, which display the content and thereby present a multidimensional scene to a subject that is in the system. In various embodiments, the controller updates the content displayed by the first, second, and/or third sets of display panels in response to information describing movement of the subject within the area. The movement of the subject may be determined from sensor data that is captured by different sensors throughout the system. For example, the sensors may measure a distance of the subject (or a portion thereof) to the sensor, and the distances are then used to triangulate the location of the subject within the area. Alternatively, the motion of the subject may be received from the omnidirectional treadmill in embodiments where the subject is on the omnidirectional treadmill. In some embodiments, the content displayed by the first, second, and/or third sets of display panels is updated by the controller in response to the controller's determination of movement of the subject within the area. This allows the content displayed by the first, second, and/or third sets of display panels to update the multidimensional scene to simulate the subject's moving through an environment that is depicted by the multidimensional scene.

**2**

For example, controller **130** modifies content displayed by one or more of first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120** based on a rate of speed at which the subject moves on the omnidirectional treadmill **105** or within the area enclosed by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120**, so the displayed content replicates the subject walking through an environment represented by the content. Similarly, the controller **130** updates content displayed by one or more of the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120** based on a direction in which the omnidirectional treadmill **105** is oriented or based on a direction of movement of the subject within the area enclosed by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120**. For example, content displayed by the first set of display panels **110** is modified to display content captured from a different point of view that corresponds to a direction in which the omnidirectional treadmill **105** is pointed in some embodiments or a direction in which the subject has moved within the area enclosed by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120**, allowing the displayed content to correspond to content from a point of view of the direction of movement of the subject or a direction of the omnidirectional treadmill **105**.

A set of sensors are configured to capture sensor data of the subject within the area while the content is displayed. For example, one or more of the sensors may include cameras that capture sensor data comprising images or video of the subject within the area. In some embodiments, the sensor data captures the subject on the omnidirectional treadmill. Texture information and a three-dimensional representation of the subject may be determined from the captured sensor data of the subject and then used to render a depiction of the subject in a three-dimensional scene to create video content. The scene in which the subject is rendered may be rendered from a three-dimensional model or may be captured by a 360-degree camera that is used to capture a location. The same scene may be displayed via the first, second, and/or third sets of display panels while the set of sensors are used to capture images of the subject, thereby giving the subject visual cues about the environment in which the subject's performance will be seen by an audience. This may assist the subject in delivering a more realistic acting performance, for example as compared to an environment in which the subject has to imagine the environment that will be seen by an audience.

In some embodiments, one or more of the sensors are coupled to a repositioning system, such as a robotic arm. The repositioning system receives instructions from the controller and moves to reposition one or more sensors coupled to the repositioning system. The controller may generate instructions for a repositioning system by determining a location within the area of a portion of the subject from sensor data captured by multiple sensors. The location of the subject within the area may be determined, for example, by measuring the distance of the subject to multiple of the sensors and then triangulating the subject's location within the area. Such generation of instructions allows the controller to reposition sensors via a coupled repositioning system, which allows the portion of the subject to remain in a field of view of the sensors as the subject moves within the area. Moreover, this enables a sensor to be fixed on a portion of the subject and thereby obtain higher-resolution information about that portion. For example, a higher-resolution camera

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

**EXHIBIT PTF-2 | p. 10**

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

## 2023 · 11-07 | Netflix US Patent 11,810,254

EXHIBIT PTF-2

2023-11-07__US11810254.pdf

SHA-256 Hash of Source File: e3099a29ef312678ece15c37ecd16e0d038c9488564a384f129b294b843f5df3

Page: 11 of 20      [ source file ]      [ .ots timestamp of source file ]      [ metadata ]

US 11,810,254 B2

**3**

can follow an actor's face, where it may be more important to have better information for later reconstruction by computer models. Beneficially, if a sensor moves with the subject as opposed to being fixed in the system, errors in the measurements may be reduced (e.g., reduced motion blur in the case of camera sensors).

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a system for enabling a digital acting performance by a subject, in accordance with an embodiment.

FIG. 2 is a side view of a system for enabling a digital acting performance by a subject, in accordance with an embodiment.

FIG. 3 is an overhead view of a portion of the system for enabling a digital acting performance by a subject, in accordance with an embodiment.

FIG. 4 is a block diagram of an alternative system for enabling a digital acting performance by a subject, in accordance with an embodiment.

FIG. 5 is a flowchart of a method for generating video content containing a digital acting performance by a subject, in accordance with an embodiment.

FIG. 6 is an example three-dimensional representation of a subject generated from captured sensor data, in accordance with an embodiment.

FIG. 7 is an example rendering of a subject generated from a three-dimensional representation of the subject and a texture image, in accordance with an embodiment.

FIG. 8 is an example image from video content that includes multiple representations of the same subject, in accordance with an embodiment.

FIG. 9 is an example image from video content that includes representations of multiple subjects, in accordance with an embodiment.

The figures depict various embodiments of the present invention for purposes of illustration only. One skilled in the art will readily recognize from the following discussion that alternative embodiments of the structures and methods illustrated herein may be employed without departing from the principles of the invention described herein.

DETAILED DESCRIPTION

System Architecture

FIG. 1 is a block diagram of one embodiment of a system 100 for enabling a digital acting performance by a subject. In the embodiment shown by FIG. 1, the system 100 includes an omnidirectional treadmill 105, a first set of display panels 110, a second set of display panels 115, a third set of display panels 120, a set of sensors 125, and a controller 130. In other embodiments, the system 100 includes different or additional components than those described in conjunction with FIG. 1. Further, in some embodiments, the system 110 includes fewer components than those described in conjunction with FIG. 1.

The omnidirectional treadmill 105 allows a subject to perform locomotive motion (e.g., walking, running, etc.) in any direction. This allows the omnidirectional treadmill 105 to provide a subject with 360 degrees of movement, reducing an amount of space occupied by the system 100 without limiting the subject's freedom of movement.

The first set of display panels 110 encloses the omnidirectional treadmill 105 and are configured to display content to a subject on the omnidirectional treadmill 105. For example, the first set of display panels 110 comprises a

**4**

plurality of light emitting diode (LED) displays, organic light emitting diode (OLED) displays, or other suitable display devices that are positioned adjacent to each other and surround the omnidirectional treadmill 105 in 360 degrees; although the first set of display panels 110 may comprise a single display panel configured to enclose or to encircle the omnidirectional treadmill 105 in some embodiments. In other embodiments, the first set of display panels 110 surround the omnidirectional treadmill 105 by 180 degrees. The first set of display panels 110 receive content from the controller 130, further described below, and display the content, allowing a subject on the treadmill to view the content. In embodiments where the first set of display panels 110 surrounds the omnidirectional treadmill 105 in 360 degrees, a subject on the treadmill is capable of viewing content via the first set of display panels 110 in all directions surrounding the subject. The first set of display panels 110 may be coupled to a wall or other structure surrounding or enclosing the omnidirectional treadmill 105 in some embodiments. Additionally, the first set of display panels 110 may extend between the second set of display panels 115 and the third set of display panels 120 in some embodiments, so the distance between the second set of display panels 115 and the third set of display panels 120 determines a height of the first set of display panels 110.

The second set of display panels 115 are positioned above the omnidirectional treadmill 105, such as on a ceiling, and are configured to display content received from the controller 130, further described below. For purposes of illustration, FIG. 1 depicts a portion of the second set of display panels 115, with the remaining portion, which would be perpendicular to the first set of display panels 110 and above the first set of display panels 110 depicted as transparent to allow viewing of the area enclosed by the first set of display panels 110 and by the second set of display panels 115. In some embodiments, the second set of display panels 115 comprises a plurality of light emitting diode (LED) displays, organic light emitting diode (OLED) displays, or other suitable display devices that are positioned above the omnidirectional treadmill 105, although the first set of display panels 110 may comprise a single display panel in some embodiments. The second set of display panels 115 is positioned a specific distance above the omnidirectional treadmill 105 in some embodiments to provide clearance between the second set of display panels 115 and a subject on the omnidirectional treadmill 105. In various embodiments, the second set of display panels 115 are coupled to a ceiling or other structure positioned above the omnidirectional treadmill 105. Alternatively, the second set of display panels 115 are suspended above the omnidirectional treadmill 105 using any suitable device. In various embodiments, the second set of display panels 115 has a width determined by a distance between a first side of the first set of display panels 110 proximate to a first side of the omnidirectional treadmill 105 and a second side of the first set of display panels 110 that is parallel to the first side of the first set of display panels 110 proximate to a second side of the omnidirectional treadmill 105. Similarly, a length of the second set of display panels 110 may be determined by a distance between a front of the first set of display panels 110 proximate to a front of the omnidirectional treadmill 105 and a rear of the first set of display panels 105 that is parallel to the front of the first set of display panels 110 proximate to a rear of the omnidirectional treadmill 105.

The third set of display panels 120 are positioned below the omnidirectional treadmill 105, such as on a floor, and are configured to display content received from the controller

Url 1: link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
Url 2: MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
Url 3: Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
Url 4: drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

## 2023 · 11-07 | Netflix US Patent 11,810,254
### EXHIBIT PTF-2

2023-11-07__US11810254.pdf

SHA-256 Hash of Source File: e3099a29ef312678ece15c37ecd16e0d038c9488564a384f129b294b843f5df3

Page: 12 of 20     [ source file ]     [ .ots timestamp of source file ]     [ metadata ]

US 11,810,254 B2

**5**

130, further described below. In some embodiments, the third set of display panels 120 comprises a plurality of light emitting diode (LED) displays, organic light emitting diode (OLED) displays, or other suitable display devices that are positioned below the omnidirectional treadmill 105; although the first set of display panels 110 may comprise a single display panel in some embodiments. The third set of display panels 120 is positioned a specific distance below a surface of the omnidirectional treadmill 105 on which a subject moves, in some embodiments, to provide clearance between the third set of display panels 120 and a subject on the omnidirectional treadmill 105. Alternatively, the second set of display panels is in a common plane as the surface of the omnidirectional treadmill 105 on which the subject moves. In various embodiments, the third set of display panels 120 are coupled to a floor or other structure positioned below the omnidirectional treadmill 105. Alternatively, the third set of display panels 120 are positioned below a surface of the omnidirectional treadmill 105 (or flush with the surface of the omnidirectional treadmill) using any suitable device. In various embodiments, the third set of display panels 120 has a width determined by a distance between a first side of the first set of display panels 105 proximate to a first side of the omnidirectional treadmill 105 and a second side of the first set of display panels 110 that is parallel to the first side of the first set of display panels 105 and proximate to a second side of the omnidirectional treadmill 105. Similarly, a length of the third set of display panels 120 may be determined by a distance between a front of the first set of display panels 110 proximate to a front of the omnidirectional treadmill 105 and a rear of the first set of display panels 110 that is parallel to the front of the first set of display panels 105 and proximate to a rear of the omnidirectional treadmill 110.

The controller 130 communicates with the first set of display panels 110, the second set of display panels 115, and the third set of display panels 120 to specify content displayed by the first set of display panels 110, the second set of display panels 115, and the third set of display panels 120. Example content displayed includes 360-degree photographs, 360-degree videos, two dimensional videos, three-dimensional videos, rendered content (e.g., real time content rendered by a graphics engine). As another example, the displayed content is video of an additional subject in an additional system 100 in a different location, allowing the subject to react to actions by the additional subject in the additional system 100. Beneficially, this allows subjects in different locations (which could be in different parts of the world) to interact with each other in real-time, or in near-real time, through the content displayed by one or more of the first set of display panels 110, the second set of display panels 115, and the third set of display panels 120. While content is displayed by the first set of display panels 110, the second set of display panels 115, and the third set of display panels 120, the set of sensors 125 captures images or video of the subject within the area enclosed by the first set of display panels 110, the second set of display panels 115, and the third set of display panels 120 (e.g., on the omnidirectional treadmill 105). The captured images or video may include reactions of the subject to the displayed content, as may include movement of the subject within the area enclosed by the first set of display panels 110, the second set of display panels 115, and the third set of display panels 120, such as movement of the subject on the omnidirectional treadmill 105, while the content is displayed by the first set of display panels 110, the second set of display panels 115, and the third set of display panels 120.

**6**

FIG. 2 is a side view of the system 100 shown in FIG. 1. As shown in FIG. 2, the system 100 includes an omnidirectional treadmill 105. A first set of display panels 110 surrounds an area, which may include the omnidirectional treadmill 105. In various embodiments, the first set of display panels 110 encircles or encloses the area, which may include the omnidirectional treadmill 105. The first set of display panels 110 may be coupled to a wall that surrounds or partially surrounds the area.

A second set of display panels 115 is positioned above the area and may be above the omnidirectional treadmill 105 in some embodiments. The second set of display panels 115 may be coupled to a ceiling or other structure positioned over the omnidirectional treadmill 105 area (or positioned over the omnidirectional treadmill 105) in some embodiments. Additionally, in some embodiments, the system 100 includes a third set of display panels 120 positioned below at least one surface of the area, such as below or in a common plane with a surface of the omnidirectional treadmill 105. The third set of display panels 120 may be coupled to a floor or another structure positioned below at least one surface of the omnidirectional treadmill 105 or of the area in some embodiments.

FIG. 3 is an overhead view of a portion of the system 100 for enabling digital acting. For purposes of illustration, FIG. 3 does not show the second set of display panels 115 positioned above the omnidirectional treadmill 105 to show additional details about the configuration of the remaining components of the system 100. Thus, FIG. 3 shows the omnidirectional treadmill 105, the first set of display panels 110, the third set of display panels 120, and the set of sensors 125. In other embodiments, the area surrounded by the first set of display panels 110 does not include the omnidirectional treadmill 105, as further described above in conjunction with FIG. 4. Further, the embodiment shown in FIG. 3 depicts a subject 305 on the omnidirectional treadmill 105 and includes an increased resolution display 310 as part of the first set of display panels 110.

As shown in FIG. 3, the first set of display panels 110 surround the omnidirectional treadmill 105. In the example of FIG. 3, the first set of display panels 110 encircle the omnidirectional treadmill 105, or an area, in 360 degrees. However, in other embodiments, the first set of display panels 110 less than fully surrounds the omnidirectional treadmill 105 or the area. For example, the first set of display panels 110 surrounds the omnidirectional treadmill 105 in 180 degrees. The display panels 110 surrounding the omnidirectional treadmill 105 may have an opening to allow for ingress and egress of an actor or other subject, where the opening may comprise a barn door or other type of door created from the display panels 110. As further described above in conjunction with FIG. 1, the first set of display panels 110 includes one or more display devices configured to display content to a subject 305 on the omnidirectional treadmill 105.

In the example shown by FIG. 3, the first set of display panels 110 includes one or more increased resolution display devices 310. An increased resolution display device 305 has a higher resolution than other display devices included in the first set of display panels 110. The increased resolution display device 310 is positioned to face the omnidirectional treadmill 105. In some embodiments, the increased resolution display device 310 is positioned to face the omnidirectional treadmill 105 and to be in a line of sight of the subject 305 on the omnidirectional treadmill 105. Further, the increased resolution display device 310 is positioned a distance away from the omnidirectional treadmill 105 that

Url 1: link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
Url 2: MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
Url 3: Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
Url 4: drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

**2023 · 11-07 | Netflix US Patent 11,810,254**

EXHIBIT PTF-2

2023-11-07__US11810254.pdf

SHA-256 Hash of Source File:  e3099a29ef312678ece15c37ecd16e0d038c9488564a384f129b294b843f5df3

Page: 13 of 20        [ source file ]        [ .ots timestamp of source file ]        [ metadata ]

US 11,810,254 B2

**7**

does not interfere with movement of the subject **305** while on the omnidirectional treadmill **105**.

The third set of display panels **120** shown in FIG. **3** are positioned below a surface of the omnidirectional treadmill **105** on which the subject **305** stands or are positioned in a common plane as the surface of the omnidirectional treadmill **105** on which the subject **305** stands. As further described above in conjunction with FIG. **1**, the third set of display panels **120** obtains content and displays the content to a subject on the omnidirectional treadmill **105**. The content displayed by the first set of display panels **110** and the third set of display panels **120** (as well as by the second set of display panels **115**) comprises a multidimensional scene, allowing the multidimensional scene to provide cohesive content to the subject **305** on the omnidirectional treadmill **105** when facing different directions.

As depicted in FIGS. **1-3**, the system **100** includes a set of sensors **125**. The set of sensors **125** may include one or more selected from a group including an optical camera, a thermal camera, an infrared camera, a movie camera, a professional video camera, a camcorder, a high-resolution camera, a pan-tilt-zoom camera, a virtual pan-tilt-zoom camera, a depth camera, and a laser depth scanner. Additional examples of sensors **125** include n other embodiments, one or more of the sensors **125** may be a depth sensor, a LIDAR sensor, an infrared sensor, a thermal sensor, a distance sensor, a motion sensor, a radar sensor, a sonar sensor, or other type of sensor. The set of sensors **125** may include multiple types of sensors, including cameras, in various embodiments. One or more cameras of the set of sensors **125** may be configured to capture images in infrared wavelengths in some embodiments, allowing capture of infrared images as well as color (e.g., RGB) images. Example sensors include cameras, proximity sensors, motion sensors, distance sensors, contact sensors, no contact sensors, load cells, or other suitable sensors. One or more of the sensors may be worn by the subject on the omnidirectional treadmill **105**, installed on the omnidirectional treadmill **105**, or positioned on a structure supporting the first set of display panels **110**, the second set of display panels **115**, or the third set of display panels **120**.

Various sensors of the set of sensors **125** may be distributed throughout a structure formed by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120**. In different embodiments, the set of sensors **125** may include different numbers of cameras or other sensors. Each sensor of the set of sensors **125** is positioned so the sensor's field of view includes a subject on the omnidirectional treadmill **105**. Each sensor **215** of the set is coupled to the controller **130** and is configured to transmit captured sensor data, such as images, to the controller **130** and to receive instructions from the controller **130**. Different sensors of the set of sensors **125** capture sensor data from different angles relative to a subject, such as a subject on the omnidirectional treadmill **105**, allowing the set of sensors **125** to capture multiple images of a subject on the omnidirectional treadmill **105** from multiple angles. In various embodiments, the sensors **125** are configured to capture sensor data in response to receiving an instruction from the controller **130**, and may be configured so multiple sensors **125** (such as all sensors of the set of sensors **125**) begin capturing images at a common time, so images captured by different sensors of the set of sensors **125** are synchronized. This synchronization enables the information captured from different sensors to be used to reconstruct a three-dimensional representation of the subject.

**8**

Referring to FIG. **4**, a block diagram of one embodiment of an alternative system **400** for enabling a digital acting performance by a subject is shown. The alternative system **400** includes a first set of display panels **110**, a second set of display panels **115**, and a third set of display panels **120**, as further described above in conjunction with FIG. **1**. The alternative system **400** also includes a set of sensors **125**, as further described above in conjunction with FIG. **1**. A subject **410** is positioned within the sets of display panels **110**, **115**, **120**. Sensors of the set of sensors **125** capture sensor data describing the subject **410** and communicate the captured sensor data to the controller **130**. As depicted in FIG. **4**, one or more sensors of the set of sensors **125** are coupled to a repositioning system **405**. In the example shown by FIG. **4**, each sensor **125** is coupled to a different repositioning system **405**. However, in other embodiments, multiple sensors **125** may be coupled to a repositioning system **405**, allowing one repositioning system **405** to reposition multiple sensors **125**. Example repositioning systems include one or more pan and tilt motors, actuators, pneumatic systems, hydraulic systems, or other suitable movers. In various embodiments, different types of repositioning systems **405** are coupled to different sensors.

At least a subset of the sensors of the set of sensors **125** may be coupled to a repositioning system **405** configured to reposition one or more of the sensors **125**. In other embodiments, each sensor **125** of the set of sensors is coupled to a repositioning system **405**. A different repositioning system **405** may be coupled to each sensor **125** in some embodiments, while in other embodiments multiple sensors of the set of sensors **125** are coupled to a repositioning system. By repositioning the sensors **125** in response to movement of the subject, the sensors can be positioned to capture more information that will be useful to depict the scene. For example, a high-resolution camera may be mounted on a repositioning system and configured to track an actor's face, thereby capturing high-resolution images of the actor's face for higher quality rendering of the final scene in places where higher quality is needed (e.g., a subject's face).

Example repositioning systems **405** include one or more pan and tilt motors, actuators, pneumatic systems, hydraulic systems, or other suitable movers. For example, one or more sensors of the set of sensors **125** is mounted to a pan and tilt robotic arm or an arm that is configured to pan or tilt or cause one or more sensors **125** to pan or tilt on the arm. Such a configuration allows the pan and tilt robotic arm to reposition one or more sensors to remain focused on a certain portion (e.g., body part such as joint, head, neck, torso, hands, legs, organ, extremity, fingers, toes, stomach, facial feature, eyes, mouth, cheek, nose) of the subject on the omnidirectional treadmill **105**. This allows the one or more sensors coupled to the pan and tilt robotic arm to capture more details of the certain body part of the subject while the subject moves on the omnidirectional treadmill **105** or otherwise moves within the system.

The repositioning system receives instructions from the controller **130** in various embodiments and adjusts a position or an orientation of one or more sensors coupled to the repositioning system based on the received instruction. As further described below, the subject or a portion of the subject can be tracked using various techniques.

In one embodiment, the controller **130** receives information about a subject captured from multiple sensors **125** that are at different known locations within the system **100**. The received information may include two-dimensional images and depth information. The controller **130** applies one or more trained models to the captured sensor data from the

Url 1: link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
Url 2: MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
Url 3: Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
Url 4: drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

**EXHIBIT PTF-2 | p. 13**

# 2023 · 11-07 | Netflix US Patent 11,810,254

## EXHIBIT PTF-2

2023-11-07__US11810254.pdf

SHA-256 Hash of Source File:  e3099a29ef312678ece15c37ecd16e0d038c9488564a384f129b294b843f5df3

Page: 14 of 20        [ source file ]       [ .ots timestamp of source file ]       [ metadata ]

US 11,810,254 B2

**9**

sensors 125 at each of the locations, where the models are trained to identify a portion of the subject in the captured sensor data. For example, a model may comprise a trained neural network that performs facial detection, which identifies a pixel or set of pixels in an image that correspond to a person's face. Other examples of models for tracking a portion of a subject include silhouette detection based skeletal tracking, optical tracking marker based skeletal tracking, and neural network based skeletal tracking models. Other example portions of the subject identified by the trained model include a joint, a head, a neck, a torso, hands, legs, an organ, an extremity, fingers, toes, a stomach, a facial feature, eyes, a mouth, a cheek, a nose, or any other suitable portion of a subject.

In some embodiments, the system may use existing trained models to detect portions of a subject, such as existing facial detection models. However, in some cases the subject may have a form for which there is not a readily available model, such as a mermaid or a cyborg character. In such cases, a new model may need to be trained to track a portion of the subject desired to be tracked, and the system can be used for training such a model. In one embodiment, the system 100 is used to obtain synthetic training data to train a model to track the subject. In such an embodiment, the controller 130 first obtains sensor data for the subject, and a three-dimensional representation is constructed therefrom. Additionally, a set of poses of a skeleton is obtained, where the poses include a motion that matches or otherwise resembles the motion of an acting performance with which the model is to be used. The set of poses may be constructed by a poser tool or obtained using traditional motion capture of a subject wearing markers. Through one or more computer generated imaging (CGI) processes, a set of annotated images (or annotated sensor data) are then generated by applying the motion capture data to the three-dimensional information of the subject, which results in representations of the subject in the desired poses and labels corresponding to the known skeletal model. The annotated images provide additional synthetic data for training the model, which beneficially does not need to be manually annotated or labeled. The machine learning model is then trained using this synthetic data to receive an image or sensor data and to output positions of specific portions of a subject. The machine learning model may be trained according to known techniques. For example, where the model is a neural network, the model is applied to the labeled data and an error term is then backpropagated based on a difference between positions of the subject output by the machine learning model and annotations of the annotated image to which the machine learning model was applied. The backpropagation modifies one or more parameters of the machine learning model based on the error term. The one or more error terms may be generated through any suitable loss function, or combination of loss functions, in various embodiments. The machine learning model may be iteratively updated a specified number of times or until one or more criteria are satisfied. The machine learning model may be an artificial neural network, such as a convolutional neural network, a recurrent neural network, a long short-term memory model, or other suitable type of artificial neural network in various embodiments.

Once the part of the subject to be tracked is detected in an image from each of a set of the sensors, the controller 130 correlates depth information captured from the same location to the locations in the images where the tracked portion is. In various embodiments, the depth information can be directly measured by a sensor or may be computed (e.g.,

**10**

using stereo cameras). Using the depth information from the sensor to the tracked portion of the subject, the controller 130 has thus obtained the distance from the subject to multiple sensors 125 used to track the subject. Moreover, the locations of the sensors 125 themselves are known.

Accordingly, the controller 130 can determine the location of the portion of the subject being tracked by triangulating the subject's distance from each of the sensors 125.

In another embodiment, a portion of a subject may be tracked using other machine vision techniques such as by placing visual markers (such as AprilTags) on portions of the subject to be tracked. An AprilTag is a visual fiducial system, useful for a wide variety of tasks including augmented reality, robotics, and camera calibration. AprilTag detection software can compute the precise three-dimensional position, orientation, and identity of the tags relative to the camera. In yet another embodiment, optical tracking systems such as motion capture can be leveraged, although using this system, additional computer graphics would be necessary. Where visual markers are used on a subject for tracking, they typically need to be removed later using computer graphics techniques. Accordingly, a benefit of using trained models to detect the subject instead of visual markers like AprilTags is to reduce the need for computer graphics processing to remove the tags in the captured video later.

Once the location of the portion of the subject is computed, the controller 130 generates instructions for one or more repositioning systems based on the location of the portion of the subject. This allows sensors coupled to a repositioning system to keep the portion of the subject within fields of view of the one or more sensors. Hence, the controller 130 may generate instructions for repositioning one or more repositioning systems by applying one or more trained models to sensor data captured by sensors of the set of sensors 125 to locate the subject or a portion of the subject within an area surrounded by the first set of display panels 110 and generating instructions so the subject or the portion of the subject remains in a field of view of one or more sensors. The tracking information can be shared across all or a subset of the repositioning systems and can trigger the repositioning of one or more of the repositioning systems as desired.

As noted above, repositioning one or more of the sensors to track the movement of the subject enables the sensor on the repositioning system to capture higher quality information. Specifically, the sensor can be repositioned so that the subject stays within a significant portion of the sensor's field of view, thereby using a larger part of the sensor's resolution. This helps to achieve zoom framing for optimal resolution. Moreover, by moving with the subject, rather than relative to the subject, the sensor can receive data for a longer period of time (e.g., longer exposure time) without incurring motion blur. Finally, by knowing the position of the subject in three-dimensional space, the sensors can be adjusted, e.g., to achieve an ideal focus or depth of field setting.

In alternative embodiments, a subject is positioned within the first set of display panels 110, to the second set of display panels 115, and to the third set of display panels 120 without the omnidirectional treadmill 105. Sensor data captured by various sensors of the set of sensors 125 is communicated to the controller 130, which provides instructions to one or more repositioning systems coupled to sensors of the set of sensors 125. In various embodiments, the controller 130 associates one or more portions of the subject's body with different sensors. Based on sensor data captured by various sensors, and locations of the sensors when the sensor data

Url 1: link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
Url 2: MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
Url 3: Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
Url 4: drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

**EXHIBIT PTF-2 | p. 14**

# 2023 · 11-07 | Netflix US Patent 11,810,254

## EXHIBIT PTF-2

US 11,810,254 B2

**11**

was captured, the controller **130** determines a position of the subject's subpart/body associated with the sensor and transmits instructions to the repositioning system coupled to the sensor. The repositioning system repositions the sensor based on the instructions received from the controller **130**, moving the sensor to keep the associated portion of the subject's body within a field of view of the sensor as the location of the subject within the first set of display panels **110**, to the second set of display panels **115**, and to the third set of display panels **120** changes. The controller **130** may apply a trained machine-learned model to identify different portions of the subject, such as further described below in conjunction with FIG. **5**, in some embodiments. However, in other embodiments, the controller may use other methods to identify portions of the subject, such as identifying visual fiducial markers applied to different portions of the subject from captured sensor data.

In some embodiments, different groups of sensors are allocated to different subjects within an area surrounded by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120**. For example, a first group of sensors are associated with a first subject and a second group of sensors are associated with the second subject. Repositioning systems coupled to sensors in the first set receive instructions from the controller **130** that are generated from a position of the first subject within the area surrounded by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120**. Similarly, repositioning systems coupled to sensors in the second set receive instructions from the controller **130** that are generated from a position of the second subject within the area surrounded by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120**. Hence, different groups of sensors may be repositioned based on movement of different subjects within the area surrounded by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120**, allowing tracking of different subjects within the area surrounded by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120** by different sensors.

The set of sensors **125** are distributed throughout a structure formed by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120**. As shown in FIG. **3**, each camera of the set of sensors **125** is positioned so the camera's field of view includes a subject on the omnidirectional treadmill **105**. Different cameras of the set of sensors **125** have different imaging angles of the subject on the omnidirectional treadmill **105**, allowing the set of sensors **125** to capture multiple images of a subject on the omnidirectional treadmill **105** from multiple imaging angles. As further described above in conjunction with FIG. **1**, at least a subset, or all, of the cameras of the set of sensors **125** may be coupled to a repositioning system configured to reposition one or more of the cameras. Each sensor **215** of the set is coupled to a controller **130** and is configured to transmit captured images to the controller **130** and to receive instructions from the controller **130**, as further described above in conjunction with FIG. **1**.

The omnidirectional treadmill **105** of FIG. **1** and the repositioning systems **405** of FIG. **4** may be combined in some embodiments, resulting in a system including both the omnidirectional treadmill **105** and the repositioning systems **405**. Such a configuration allows one or more sensors to be positioned, while allowing the subject to move on the omnidirectional treadmill **105**. Other embodiments include

**12**

the omnidirectional treadmill **105** with fixed sensors, and alternative embodiments have sensors coupled to repositioning systems **405** without including a treadmill within the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120**. Hence, different embodiments may include one or more of the omnidirectional treadmill **105** and the repositioning systems **405**.

In some embodiments, one or more illumination sources are also positioned relative to the first set of display panels **110**, to the second set of display panels **115**, and to the third set of display panels **120** and are configured to emit light that illuminates the subject on the omnidirectional treadmill **105**. In some embodiments, the illumination sources include one or more infrared projectors configured to emit light in infrared wavelengths to illuminate one or more portions of the subject, or to illuminate the subject. Some illumination sources may emit light in both visible wavelengths and in infrared wavelengths in some embodiments. Such infrared illumination allows the set of sensors **125** to capture additional features for use in generating a reconstruction of the subject, as further described below in conjunction with FIG. **5**.

In some embodiments, when capturing images or video of the subject within the area enclosed by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120** (e.g., the subject on the omnidirectional treadmill **105**), the controller **130** configures the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120** to apply realistic lighting to the subject within the area enclosed by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120** (e.g., on the omnidirectional treadmill **105**). This increases realism of the captured images or video of the subject within the area enclosed by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120**. Alternatively, the controller configures the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120** to apply neutral lighting to the subject within the area enclosed by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120**. In some embodiments, the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120** apply neutral lighting by color correcting content displayed on the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120** to a set of gray values with low contrast in response to an instruction from the controller **130**.

Applying neutral lighting to the subject within the area enclosed by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120** (e.g., on the omnidirectional treadmill **105**) when capturing the sensor data allows the sensor data (e.g., videos, images) to be more easily modified by one or more CGI methods to be relit for different lighting conditions (e.g., lighting corresponding to different positions of a light source relative to the subject within the area enclosed by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120**, lighting corresponding to different times of day). Further, the controller **130** may provide instructions to the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120** to partially illuminate the subject using realistic lighting and to partially illuminate the subject on the omnidirectional treadmill using neutral lighting. In other embodiments, instructions provided by the controller **130** change

Url 1: link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
Url 2: MnCourtFraud.Substack.com/api/v1/file/9e7d2751-fd53-4bb2-bb58-f7703f04ee2d.pdf
Url 3: Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
Url 4: drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

# 2023 · 11-07 | Netflix US Patent 11,810,254

## EXHIBIT PTF-2

US 11,810,254 B2

**13**

illumination of the subject at different time intervals. For example, the instructions cause the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120** to illuminate the subject with neutral lighting during a first time interval and to illuminate the subject with realistic lighting during another time interval. In some embodiments, the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120** alternate between illuminating the subject using neutral lighting and using realistic lighting during consecutive time intervals (e.g., 48 frames per second).

The omnidirectional treadmill **105**, the first set of display panels **110**, the second set of display panels **115**, the third set of display panels **120**, and the set of sensors **125** is coupled to a controller **130** through a wireless connection, a wired connection, or a combination of wireless and wired connections. The controller **130** includes a processor and a non-transitory computer readable storage medium having instructions encoded thereon that, when executed by the processor, cause the processor to perform the functions further described below. The controller **130** receives images captured by cameras of the set of sensors **125** and stores the received images. In various embodiments, the controller **130** receives video captured by cameras from the set of sensors **125**. Additionally, the controller **130** transmits content, or instructions for obtaining content, to one or more of the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120** for display.

In various embodiments, optionally, the controller **130** transmits content to the first set of display panels **110**, to the second set of display panels **115**, and to the third set of display panels **120** to display visual cues (e.g., QR codes, barcodes, April tags, etc.) to a subject on the omnidirectional treadmill **105**. For example, visual cues displayed by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120**, provide instructions to the subject for a configuration process. As an example, displayed visual cues identify a configuration pose, such as a pose where the subject's body resembles the letter "T," for the subject to perform. The T-pose may be helpful to enable more complex computer graphics techniques, but may not be required to capture general digital acting performances. The set of sensors **125** capture configuration images of the subject in the configuration pose. One or more of the configuration images captured of the subject in the configuration pose include the visual cues displayed by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120**. In other embodiments, any suitable information may be displayed by the visual cues displayed by the first set of display panels **110**, the second set of display panels **115**, or the third set of display panels **120**.

In various embodiments, the controller **130** analyzes the sensor data to generate a three-dimensional representation of the subject **410**. The three-dimensional representation may take any appropriate form, such as a polygonal model, a volumetric model, a point cloud model, or any other type of model that can represent three-dimensional data and its color. Examples of a three-dimensional representation of the subject include a three-dimensional polygonal model, volumetric representation, neural network representation, implicit surface representation, or other models, of contents of the captured sensor data. Various methods could be used for example photogrammetry, mesh generation from lidar point clouds, mesh generation from various depth maps, other methods from sensors such as quantum lidar sensors, etc. For example, the control generates information representing objects within the area enclosed by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120** and within a field of view of at least one camera of the set of sensors **125**. In some embodiments, the controller **130** generates information describing a specific object (e.g., the subject) within fields of view of one or more sensors of the set of sensors **125**. For example, the controller **130** generates the three-dimensional representation of the subject on the omnidirectional treadmill **105** and removes or filters other objects included in fields of view of one or more cameras of the set of sensors **125**.

Additionally, from color information obtained by cameras of the set of sensors **125**, the controller **130** generates a texture image for applying texture to the three-dimensional representation of the subject. In some embodiments, the texture image is a two-dimensional image. To generate the texture image, in some embodiments, the controller **130** determines a color value for each point on the three-dimensional representation of the subject (e.g., each point on a three-dimensional polygonal model) from a sensor of the set of sensors **125** that points perpendicular to the surface normal of the point of the three-dimensional representation of the subject. Selecting the color value for a point of the three-dimensional representation of the subject from a sensor that is perpendicular to the surface normal of the point minimizes reflective or specular color of the color value. This results in a color texture map for the three-dimensional representation of the subject including a lighting component that is capable of later rendering through one or more CGI methods from various angles. In other embodiments, the texture map is a final sensor angle dependent generated texture map. In such embodiments, the final camera angle from which a camera captured images of the subject within the area enclosed by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120** (e.g., on the omnidirectional treadmill **105**) or other object, weighting logic is used to determine the texture image. For example, the controller **130** compares an angle of the final sensor relative to angles at which other cameras of the set of sensors **125** captured images. During creation of the texture image, the controller **130** weights images captured by sensors of the set of sensors **125** having angles at which images were captured that are within a threshold value of the angle of the final sensor. Using the final sensor angle results in a realistic texture image for the three-dimensional representation of the subject.

As further described below in conjunction with FIG. **5** the controller **130** may use the three-dimensional representation of the subject in a three-dimensional scene to render video data that depicts an acting performance of the subject that was captured within the area enclosed by the sets of display panels **110**, **115**, **120** and optionally on the omnidirectional treadmill **105**. This rendering may be performed by one or more servers or other computing devices that are separate from the controller **130**. In various embodiments, as further described below in conjunction with FIG. **5**, the three-dimensional representation of the subject and the texture image are used to generate the video data containing the subject's acting performance.

Generation of Media Content Containing a Three-Dimensional Representation of a Subject

FIG. **5** is a flowchart of one embodiment of a method for generating media content (such as video data) containing a three-dimensional representation of a subject from a system for enabling a digital acting performance, such as the system **100** further described above in conjunction with FIGS. **1-4**.

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

# 2023 · 11-07 | Netflix US Patent 11,810,254

## EXHIBIT PTF-2

2023-11-07__US11810254.pdf

SHA-256 Hash of Source File: e3099a29ef312678ece15c37ecd16e0d038c9488564a384f129b294b843f5df3

Page: 17 of 20     [ source file ]     [ .ots timestamp of source file ]     [ metadata ]

US 11,810,254 B2

**15**

Although this method is described using examples for generating video data, any appropriate depiction of the subject's acting performance from the three-dimensional representation of the subject from the captured sensor data is possible. In various embodiments, the method includes different or additional steps than those described in conjunction with FIG. 5. Further, in some embodiments, the method may perform the steps in a different order than the order described in conjunction with FIG. 5 or may include fewer steps than those described in conjunction with FIG. 5.

In the process shown in FIG. 5, a subject is first positioned inside an area that is contained by a first set of display panels **110** at least partially enclosing the area. The area may contain an omnidirectional treadmill **105**, on which the subject may stand and move around without actually leaving the area. In various embodiments, a second set of display panels **115** is positioned above the omnidirectional treadmill **105**, and a third set of display panels **120** may be positioned below a surface of the omnidirectional treadmill **105** or in a common plane as the surface of the omnidirectional treadmill **105**. A set of sensors **125** are positioned to capture information (e.g., images, video, depth, etc.) of the subject from different angles and from different locations around the area.

One or more of the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120** display **505** content to the subject. In various embodiments each of the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120** display content to the subject so the combination of content displayed by the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels **120** displays a multidimensional scene to the subject. In various embodiments, the content displayed to the subject is obtained from the controller **130**.

The content displayed on the panels may be obtained, e.g., from a 360-degree camera that captures a scene that depicts the scene in which the subject's acting performance is to be inserted, albeit without the subject's performance. To provide realistic visual cues for the subject, the content may be obtained by capturing the scene from the perspective of the subject—i.e., the point of view where the subject is to be inserted into the scene. This way, the subject will see the scene from the perspective of the subject's character in the final product. If the scene is generated from a three-dimensional model instead of captured by a camera, the content to be displayed to the subject instead be rendered from the perspective of the subject's character using CGI techniques, such as ray tracing.

While the content is being displayed **505** to the subject, the set of sensors **125** capture **510** sensor data depicting the subject at different times (e.g., continuously capture the subject while the subject performs within the area), such as a sequence of images or video of the subject. This allows the set of sensors **125** to capture movement or reactions of the subject while the content is displayed **505**, as further described above in conjunction with FIG. 1. Hence, the sensor data captured **510** by the set of sensors **125** describe the subject's interactions with or reactions to the displayed content. Displaying content to the subject via the first set of display panels **110**, the second set of display panels **115**, and the third set of display panels allows the subject's movement or reactions to more accurately reflect an environment with which the subject interacts, compared to conventional methods that use inanimate objects or other props to a subject and subsequently insert portions of the subject's environment in place of the inanimate objects or other props after capturing

**16**

images of the subject. This greatly improves the experience for the subject, for example, when delivering a performance.

As further described above in conjunction with FIG. 1, the controller **130** generates **515** a three-dimensional representation of the subject and a texture image from the captured sensor data while the content was displayed **505** to the subject. FIG. 6 shows one example of a three-dimensional representation **1000** of the subject generated by the controller **130** from the captured sensor data. As further described above in conjunction with FIG. 1, the texture image describes application of texture to the three-dimensional representation of the subject from color information or information describing angles at which sensors of the set of sensors **125** captured images or video of the subject. FIG. 7 shows an example rendering of a subject generated from a three-dimensional representation of the subject and a texture image applied to the three-dimensional representation.

The three-dimensional representation of the subject is then inserted **520** into a target scene. In an embodiment where the target scene is rendered from a three-dimensional model, the three-dimensional representation of the subject is placed at a desired location in the model. In an embodiment where the target scene is captured by a camera, a location of a virtual camera relative to the three-dimensional representation is determined so that a two-dimensional representation of the subject may be rendered and combined with the target scene captured by the camera.

In various embodiments, final content for the scene that includes the acting performance of the subject is generated **525**. The final content may comprise a series of image frames that constitute a video sequence, and may be in any format desired (e.g., film format of 24 frames per second). To generate **525** the final content of the scene, in one embodiment, the three-dimensional model of the scene containing the three-dimensional representation of the subject is rendered to create a final output. For example, the final content can be generated **525** from the texture image and the three-dimensional representation of the subject using one or more CGI methods. For example, frames of the subject in the target scene corresponding to different times when sensor data was captured are rendered, allowing generation of the final content at a desired frame rate. This allows the system to generate **525** a series of frames that contain the acting performance of the subject over time and inserted within the target scene.

In various embodiments, renderings of the subject from its three-dimensional representation may be used to subsequently generate content including the subject from one or more camera angles relative to the subject, allowing the subject to be displayed from various angles or with various lighting parameters. For example, a rendering of the subject may be inserted into a three-dimensional scene, and a sequence of frames of the subject in the three-dimensional scene may be rendered by ray tracing from a virtual camera having a specified position relative to the subject, allowing generation of content depicting the subject within or interacting the three-dimensional scene. Hence, generating **525** the final content containing the subject enables the subject's performance to be subsequently inserted into different video or other content, allowing the environment in which the digital copy of the subject is presented in the video to be designed and constructed after the digital copy of the subject has been generated **525**. This provides greater flexibility in how the digital copy of the subject is used in content and reduces costs by allowing the subject to be included in a range of different content without separately capturing video of the subject in different content. Further, using renderings

Url 1: link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
Url 2: MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
Url 3: Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
Url 4: drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

**EXHIBIT PTF-2 | p. 17**

# 2023 · 11-07 | Netflix US Patent 11,810,254

## EXHIBIT PTF-2

US 11,810,254 B2

**17**

of the three-dimensional information of the subject's performance allows for a wider range of positions in which a virtual camera may be positioned relative to of the subject when generating content.

One of the capabilities of the system described herein is illustrated by FIG. **8**, which shows an example image from video content that includes multiple representations of the same subject. In film, it may be desired to have an actor appear multiple times in a single image or in a single sequence of video (e.g., a twin scene). Conventionally, this duplication of an actor has been achieved using a split screen. However, the split screen approach is made complicated, costly, time-consuming, or laborious with moving cameras and complex movements of the actor. Embodiments of the system for enabling a digital acting performance described herein, provide a more efficient way to duplicate an actor in a single image or sequence of video.

To duplicate a subject in an image or in a sequence of video, a target scene **800** containing images of one version of the subject is captured. The target scene **800** can be captured by simply filming the subject using conventional video cameras, for example using a 360-degree camera that captures images along one or more of a horizontal orbit, a vertical orbit, or a diagonal orbit around the subject. This allows images or video of the subject to be captured, while the 360-degree camera captures images of the surroundings of the subject from the alternative location where the duplicate of the subject is to appear. Alternatively, the target scene **800** may be generated using the process described in FIG. **5**. Once the target scene containing one version **805** of the subject is obtained, it is used as the content displayed to the same subject in the process described in FIG. **5**, thereby inserting a second version **810** of the same subject in the final content. This way, the subject benefits from visual cues from the subject's first acting performance when performing a second time as the twin.

Another use case of the system is illustrated by FIG. **9**, which shows an example of an image **900** including representations of multiple subjects. In the example of FIG. **9**, multiple representations **905A**, **905B**, **905C**, **905D** (also referred to individually and collectively using reference number **905**) are included in the image **900**. Each representation **905** of a subject is generated from sensor data of the subject captured by the system **100** or the system **400** using the process of FIG. **5**. To generate the image **900**, in one example, the controller **130** provides content containing a target scene to a first subject **905** and captures a three-dimensional representation of the first subject **905**, e.g., using the process of FIG. **5**. The three-dimensional representation of the first subject **905** is then added to the target scene, and this modified content is presented to another subject **905**, whose acting performance is then captured according to the process of FIG. **5**. This is repeated for each of the subjects **905** until all of their acting performances are captured. The final content is then obtained by rendering the three-dimensional representations of each of the subjects **905** into the target scene to create the final content.

Beneficially, inserting digital copies of one or more subjects into edited video allows the video to be captured with fewer subjects present when the video is initially captured. This reduces the complexity for initially obtaining the video, while maintaining flexibility for a number of subjects included in the edited video or which subjects are included in the edited video. Additionally, inserting a digital copy of the subject into the edited video allows subjects to be in different locations from each other when video is captured,

**18**

reducing an amount of travel for subjects, and reducing an amount of time for capturing different portions of video including multiple subjects.

ADDITIONAL CONSIDERATIONS

The foregoing description of the embodiments of the invention has been presented for the purpose of illustration; it is not intended to be exhaustive or to limit the invention to the precise forms disclosed. Persons skilled in the relevant art can appreciate that many modifications and variations are possible in light of the above disclosure.

Some portions of this description describe the embodiments of the invention in terms of algorithms and symbolic representations of operations on information. These algorithmic descriptions and representations are commonly used by those skilled in the data processing arts to convey the substance of their work effectively to others skilled in the art. These operations, while described functionally, computationally, or logically, are understood to be implemented by computer programs or equivalent electrical circuits, microcode, or the like. Furthermore, it has also proven convenient at times, to refer to these arrangements of operations as modules, without loss of generality. The described operations and their associated modules may be embodied in software, firmware, hardware, or any combinations thereof.

Any of the steps, operations, or processes described herein may be performed or implemented with one or more hardware or software modules, alone or in combination with other devices. In one embodiment, a software module is implemented with a computer program product comprising a computer-readable medium containing computer program code, which can be executed by a computer processor for performing any or all of the steps, operations, or processes described.

Embodiments of the invention may also relate to an apparatus for performing the operations herein. This apparatus may be specially constructed for the required purposes, and/or it may comprise a general-purpose computing device selectively activated or reconfigured by a computer program stored in the computer. Such a computer program may be stored in a non-transitory, tangible computer readable storage medium, or any type of media suitable for storing electronic instructions, which may be coupled to a computer system bus. Furthermore, any computing systems referred to in the specification may include a single processor or may be architectures employing multiple processor designs for increased computing capability.

Embodiments of the invention may also relate to a product that is produced by a computing process described herein. Such a product may comprise information resulting from a computing process, where the information is stored on a non-transitory, tangible computer readable storage medium and may include any embodiment of a computer program product or other data combination described herein.

Finally, the language used in the specification has been principally selected for readability and instructional purposes, and it may not have been selected to delineate or circumscribe the inventive subject matter. It is therefore intended that the scope of the invention be limited not by this detailed description, but rather by any claims that issue on an application based hereon. Accordingly, the disclosure of the embodiments of the invention is intended to be illustrative, but not limiting, of the scope of the invention, which is set forth in the following claims.

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

**EXHIBIT PTF-2 | p. 18**

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

# 2023 · 11-07 | Netflix US Patent 11,810,254
## EXHIBIT PTF-2

2023-11-07__US11810254.pdf

SHA-256 Hash of Source File:  e3099a29ef312678ece15c37ecd16e0d038c9488564a384f129b294b843f5df3

Page: 19 of 20       [ source file ]       [ .ots timestamp of source file ]       [ metadata ]

US 11,810,254 B2

**19**

What is claimed is:

**1**. A system comprising:

a first set of display panels surrounding an area;

a set of sensors positioned at a set of angles, each angle different from other angles of the set, each sensor of the set configured to capture sensor data of a subject positioned within the area;

one or more repositioning systems coupled to at least a subset of the sensors, a repositioning system configured to reposition a sensor in response to receiving an instruction; and

a controller coupled to the first set of display panels and to the set of sensors, the controller configured to:

transmit content to the first set of display panels for display, the content displayed by the first set of display panels comprising a multidimensional scene;

receive sensor data of the subject within the area captured by a plurality of sensors of the set of sensors while the multidimensional scene is displayed by the first set of display panels;

determine, based on the sensor data, a relative motion of the subject with respect to the first set of display panels;

generate instructions for repositioning one or more of the sensors based on the determined location relative motion of the subject within the area; and

transmit the instructions to at least a set of the one or more repositioning systems to reposition at least the subset of sensors according to the generated instructions.

**2**. The system of claim **1**, further comprising:

a second set of display panels positioned above the area; and

a third set of display panels positioned opposite to the second set of display panels and coupled to the controller, the third set of display panels configured to receive additional content comprising the multidimensional scene from the controller and to display the third content.

**3**. The system of claim **1**, further comprising an omnidirectional treadmill located within the area.

**4**. The system of claim **3**, wherein the set of sensors are configured to:

capture sensor data of the subject positioned on the omnidirectional treadmill.

**5**. The system of claim **1**, wherein the controller is further configured to:

generate three-dimensional representation of the subject from the received sensor data.

**6**. The system of claim **1**, wherein a repositioning system comprises an arm configured to reposition one or more sensors in response to receiving an instruction from the controller.

**7**. The system of claim **6**, wherein the instruction from the controller causes the arm to reposition the one or more sensors so a certain portion of the subject is within a field of view of the one or more sensors.

**8**. The system of claim **7**, wherein the arm comprises a pan and tilt robotic arm or an arm that is configured to pan or tilt or cause one or more sensors to pan or tilt on the arm.

**9**. The system of claim **1**, wherein the controller is further configured to:

generate a three-dimensional representation of the subject from the received sensor data.

**10**. The system of claim **9**, wherein the controller is further configured to:

**20**

generate a texture image configured to apply texture to the three-dimensional representation of the subject from the received sensor data.

**11**. A system comprising:

an omnidirectional treadmill;

a first set of display panels surrounding an area containing the omnidirectional treadmill;

a set of sensors positioned at a set of angles, each angle different from other angles of the set, each sensor of the set configured to capture sensor data of a subject positioned on the omnidirectional treadmill; and

a controller coupled to the omnidirectional treadmill, to the first set of display panels, and to the set of sensors, the controller configured to:

transmit content to the first set of display panels for display, the content displayed by the first set of display panels comprising a multidimensional scene;

receive sensor data of the subject positioned on the omnidirectional treadmill captured by a plurality of sensors of the set of sensors while the multidimensional scene is displayed;

determine, based on the sensor data, a relative motion of the subject with respect to the first set of display panels;

generate instructions for repositioning one or more of the sensors based on the determined relative motion of the subject within the area; and

transmit the instructions to a set of one or more repositioning systems to reposition at least one of the set of sensors according to the generated instructions.

**12**. The system of claim **11**, further comprising:

a second set of display panels positioned above the omnidirectional treadmill; and

a third set of display panels positioned below the omnidirectional treadmill and opposite to the second set of display panels and coupled the controller, the third set of display panels configured to receive additional content comprising the multidimensional scene from the controller and to display the third content.

**13**. The system of claim **11**, wherein the controller is configured to modify the content displayed by the first set of display panels based on information from the omnidirectional treadmill describing movement of the subject.

**14**. The system of claim **11**, further comprising:

one or more repositioning systems coupled to at least a subset of the sensors, a prepositioning system configured to reposition a sensor in response to receiving an instruction.

**15**. The system of claim **14**, wherein the controller is further configured to:

generate instructions for repositioning one or more of the sensors based on a determined location of at least a portion of the subject within the area; and

transmit the instructions to at least a set of the one or more repositioning systems.

**16**. The system of claim **11**, wherein the controller is further configured to:

generate a three-dimensional representation of the subject from the received sensor data.

**17**. The system of claim **16**, wherein the controller is further configured to:

generate a texture image configured to apply texture to the three-dimensional representation of the subject from the received sensor data.

Url 1: link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
Url 2: MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
Url 3: Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
Url 4: drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

**EXHIBIT PTF-2 | p. 19**

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

**2023 · 11-07 | Netflix US Patent 11,810,254**

EXHIBIT PTF-2

2023-11-07__US11810254.pdf

SHA-256 Hash of Source File:  e3099a29ef312678ece15c37ecd16e0d038c9488564a384f129b294b843f5df3

Page: 20 of 20        [ source file ]        [ .ots timestamp of source file ]        [ metadata ]

US 11,810,254 B2

21

22

**18**. A method comprising:

displaying a set of images to a subject positioned within an area enclosed by a set of display panels at least partially surrounding the area;

capturing sensor data of an acting performance of the subject within the area using a set of sensors positioned at a set of angles, each angle different from other angles of the set of angles and each sensor of the set of sensors configured to have a field of view within at least a portion of the area;

determining, based on the sensor data, a relative motion of the subject with respect to the set of display panels;

repositioning at least one sensor of the set of sensors based on the determined relative motion of the subject within the area;

generating a three-dimensional representation of the subject from the sensor data of the subject captured by the set of sensors; and

generating texture data for applying texture to the three-dimensional representation of the subject from the sensor data of the subject captured by the set of sensors.

**19**. The method of claim **18**, further comprising:

generating video data of the acting performance of the subject by rendering the three-dimensional representation of the subject and the texture data in a scene.

\*    \*    \*    \*    \*

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

**EXHIBIT PTF-2 | p. 20**

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

**2025 · 02-28 | Netflix Patent Theft**

EXHIBIT PTF-2

125__Exhibit-List_M-Q__Netflix-Patent-Theft__2025-02-28.pdf

SHA-256 Hash of Source File:  927fbe182ccd5983fb9c7fab0868a010d3cbb376654c75feba7b4630f1a1fc68

Page: 6 of 23          [ source file ]     [ .ots timestamp of source file ]     [ pdf signatures ]     [ metadata ]

# Analysis of Guertin's InfiniSet Patent v. Netflix Patent:

## I. Executive Summary

InfiniSet's US Patent 11,577,177, granted on February 14, 2023, describes a "motorized rotatable treadmill" used within virtual film sets (including green screen and LED environments) to create the illusion of unlimited movement. Netflix's US Patent 11,810,254, granted on November 7, 2023, discloses a system that uses an "omnidirectional treadmill" together with multiple sets of display panels (floor, wall, and ceiling) to achieve a similar effect—namely, allowing a subject to move in 360° within a virtual environment. Crucially, InfiniSet's patent is prior art, having a priority date 12 days earlier than Netflix's application, and InfiniSet's patent was even formally submitted as third-party prior art during Netflix's prosecution.

Our analysis concludes that the technology described in Netflix's patent appears to be essentially the same as that disclosed in InfiniSet's patent, differing primarily in terminology and presentation. We argue that (1) the "rotating treadmill" in InfiniSet's patent inherently provides omnidirectional movement, and (2) the LED volume or virtual film set—comprising distinct LED panels for the floor, walls, and ceiling—is a standard industry configuration that InfiniSet's disclosure already contemplates. As such, the Netflix patent's claims appear to be obvious in view of InfiniSet's disclosure and may fail the novelty and non-obviousness requirements. This report outlines our detailed comparisons and offers the grounds for challenging the validity of Netflix's patent.

---

## VI. Conclusion and Recommendations

Based on the foregoing analysis, the following conclusions are drawn:

1. **Essentially the Same Technology:**
   Both patents describe systems that use a treadmill (whether labeled "rotatable" or "omnidirectional") integrated with an LED virtual film set to create the illusion of unrestricted movement. The key functionality is identical: allowing a subject to traverse a virtual environment without leaving a confined physical area.

2. **Prior Art and Obviousness:**
   InfiniSet's patent not only precedes Netflix's filing by 12 days but was also submitted as prior art during Netflix's examination. This raises a strong argument that the Netflix patent fails to meet the requirements for novelty and non-obviousness.

3. **Terminology Is Largely Superficial:**
   The Netflix patent's use of "omnidirectional treadmill" is a broader, yet functionally equivalent, term compared to InfiniSet's "motorized rotatable treadmill." Similarly, while

Exhibit M  |  p. 1

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 21

125__Exhibit-List_M-Q__Netflix-Patent-Theft__2025-02-28.pdf

SHA-256 Hash of Source File: 927fbe182ccd5983fb9c7fab0868a010d3cbb376654c75feba7b4630f1a1fc68

Page: 7 of 23      [ source file ]     [ .ots timestamp of source file ]     [ pdf signatures ]     [ metadata ]

---

27-CR-23-1886

Filed in District Court<br>
State of Minnesota<br>
2/28/2025 4:42 PM

Netflix divides the LED virtual film set into three distinct panel groups, this arrangement is standard practice and is implicitly covered by InfiniSet's disclosures.

**Recommendation:**

Given these points, it is our professional opinion that there are strong grounds to challenge the validity of US Patent 11,810,254. The Netflix patent appears to be an obvious extension of the technology already disclosed in US Patent 11,577,177. We recommend that the USPTO be urged to reconsider the grant of the Netflix patent on the basis of:

- **Prior Art:** InfiniSet's patent clearly anticipates and renders obvious the disclosures of Netflix.

- **Obviousness:** The differences in terminology and presentation do not constitute a novel or non-obvious improvement over InfiniSet's technology.

- **Industry Standard Practices:** The LED volume or virtual film set configuration (with separate floor, wall, and ceiling panels) is a known standard and is already encompassed within the InfiniSet disclosure.

In light of these observations, there is a compelling argument that the Netflix patent should not have been granted, and steps should be taken to challenge its validity to protect InfiniSet's intellectual property rights.

---

## VII. Appendices: Direct Excerpts

1. **InfiniSet Patent (US 11,577,177):**

   - **Abstract Excerpt:**

     *"A motorized, rotatable treadmill and a system for creating the illusion of user movement while the user is stationary with respect to an environment…"*

   - **Detailed Description Excerpt:**

     *"The treadmill is configured to provide a user a surface for movement in forward and reverse directions … and wherein the angular direction … is selectively adjustable via rotation of the turntable for directionally unlimited movement in an X-Y plane."*

2. **Netflix Patent (US 11,810,254):**

   - **Treadmill Excerpt:**

     *"…the omnidirectional treadmill allows a subject to perform locomotive motion (e.g., walking, running, etc.) in any direction. This*

Exhibit M | p. 2

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

**EXHIBIT PTF-2 | p. 22**

125__Exhibit-List_M-Q__Netflix-Patent-Theft__2025-02-28.pdf

SHA-256 Hash of Source File:  927fbe182ccd5983fb9c7fab0868a010d3cbb376654c75feba7b4630f1a1fc68

Page: 8 of 23          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
2/28/2025 4:42 PM

*allows the omnidirectional treadmill to provide a subject with 360 degrees of movement."*

- **Display Panels Excerpts:**

  *"A system surrounds an area with a first set of display panels."*

  *"A second set of display panels is positioned above the area…"*

  *"A third set of display panels is positioned below the area…"*

## Final Summary:

In summary, the evidence strongly suggests that Netflix's US Patent 11,810,254 describes essentially the same technology as InfiniSet's US Patent 11,577,177. Given the 12-day lead in priority, the use of InfiniSet's patent as prior art, and the minimal substantive differences in technology (merely differences in terminology and presentation), there is a robust argument that the Netflix patent is invalid for lack of novelty and non-obviousness. It is recommended that this matter be pursued further through appropriate legal channels to challenge the validity of the Netflix patent.

**The full analysis document is available here:**

https://link.storjshare.io/raw/jvj3zbhx4dc4vxpjuppy2yba2v4q/court-fraud/The-Patent-is-the-Motive/InfiniSet-Patent__Compared-to-Netflix-Patent-Report.pdf

**All of the additional patent background documents are available here:**

https://link.storjshare.io/s/jvqbgvfz7qnvqna53bijp3fpjcba/court-fraud/The-Patent-is-the-Motive/

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

## 2025 · 02-28 | Netflix Patent Theft
EXHIBIT PTF-2

125__Exhibit-List_M-Q__Netflix-Patent-Theft__2025-02-28.pdf
SHA-256 Hash of Source File:  927fbe182ccd5983fb9c7fab0868a010d3cbb376654c75feba7b4630f1a1fc68
Page: 9 of 23        [ source file ]        [ .ots timestamp of source file ]        [ pdf signatures ]        [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
2/28/2025 4:42 PM

# Advanced Technology Comparison of Both Patents:

## I. Overview of the Advanced Technologies Disclosed

Both patents present a system in which a specialized treadmill assembly is integrated into a digital environment. Although the virtual film production use case is their common foundation, each disclosure goes on to describe additional advanced functionalities that extend the system's application into several high-tech fields:

1. **Immersive Digital Environments (VR, AR, Metaverse):**
   Both disclosures envision applications beyond traditional film production. They describe environments that can be rendered digitally or virtually—for use in gaming, simulation training, or the metaverse—where a user experiences seamless, immersive movement.

2. **Real-Time Tracking and Cueing for Unnoticeable Treadmill Use:**
   The patents describe systems in which the user's movement is tracked in real time and synchronized with the motion of a camera and/or digital cues. This integration is designed so that the user's experience is natural and immersive, effectively masking the fact that they remain on a treadmill.

3. **Digital Twin Creation:**
   Both patents include provisions for capturing a three-dimensional representation of the user (often referred to as a "digital twin") using multi-camera photogrammetry and other sensor technologies. This digital twin can then be inserted into virtual environments for various applications.

4. **Simulation Training and Gaming Applications:**
   Beyond film production, the systems are envisioned for simulation training exercises and gaming. In such use cases, a realistic digital representation of the user—synchronized with real-time movement data—is critical for effective training simulations or immersive game play.

5. **Remote Connectivity and Multi-System Integration:**
   Both disclosures mention that the treadmill system's components (motors, sensors, display interfaces) can be controlled remotely and integrated with other systems. This supports scenarios in which multiple treadmill assemblies or remote setups are networked together.

Exhibit N |  p. 1

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 24

# 2025 · 02-28 | Netflix Patent Theft

EXHIBIT PTF-2

125__Exhibit-List_M-Q__Netflix-Patent-Theft__2025-02-28.pdf

SHA-256 Hash of Source File: 927fbe182ccd5983fb9c7fab0868a010d3cbb376654c75feba7b4630f1a1fc68

Page: 10 of 23          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
2/28/2025 4:42 PM

## III. Summary of Comparative Findings

The following ordered list summarizes the advanced technological fields and use cases and shows how InfiniSet's disclosure preempts the corresponding aspects in the Netflix patent:

1. **Immersive Environments (VR/AR/Metaverse):**

   - **InfiniSet:** Broadly discloses integration with digital/virtual environments using an animation timeline and cue sequencing.
   - **Netflix:** Uses segmented LED panel arrangements to create an immersive space.
   - **Finding:** InfiniSet already covers the use of virtual environments in a broad, application-independent manner.

2. **Real-Time User Tracking & Cueing:**

   - **InfiniSet:** Details real-time tracking with integrated sensors, wearable devices, and haptic cues.
   - **Netflix:** Captures sensor data and uses repositioning to maintain accurate digital representations.
   - **Finding:** Both systems function similarly, with InfiniSet's disclosure being broad and fundamental.

3. **Digital Twin Creation:**

   - **InfiniSet:** Explicitly describes creating a digital twin or avatar using multi-angle photogrammetry.
   - **Netflix:** Generates a 3D representation and texture mapping for a digital acting performance.
   - **Finding:** The digital twin capability is disclosed in both patents, with InfiniSet's earlier disclosure preempting Netflix's claims.

4. **Simulation Training and Gaming Applications:**

   - **InfiniSet:** Mentions direct applications in simulation training and gaming, including integration with VR systems.
   - **Netflix:** Although focused on digital acting, the underlying technology is applicable to simulation and gaming.
   - **Finding:** InfiniSet's technology is sufficiently broad to encompass these use cases.

Exhibit N | p. 2

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 25

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

# 2025 · 02-28 | Netflix Patent Theft
## EXHIBIT PTF-2

125__Exhibit-List_M-Q__Netflix-Patent-Theft__2025-02-28.pdf
SHA-256 Hash of Source File:  927fbe182ccd5983fb9c7fab0868a010d3cbb376654c75feba7b4630f1a1fc68
Page: 11 of 23          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

5. **Remote Connectivity and System Integration:**

- **InfiniSet:** Provides for remote control and synchronization with other equipment.
- **Netflix:** Similarly describes remote operation of the treadmill and sensor network.
- **Finding:** Remote connectivity is a common feature, with InfiniSet covering it comprehensively.

6. **Additional Advanced Cueing & Multi-Sensor Integration:**

- **InfiniSet:** Uses audio, visual, tactile, and haptic cues in combination with wearable sensors and an animation timeline.
- **Netflix:** Implements similar repositioning and sensor fusion techniques to maintain digital accuracy.
- **Finding:** Both patents disclose similar systems; InfiniSet's approach is broad and foundational.

---

## IV. Conclusion

Based on the comparative analysis, the advanced technological capabilities disclosed in InfiniSet's US Patent 11,577,177 encompass:

- **Integration with immersive digital environments** (VR, AR, metaverse)
- **Real-time user tracking and seamless movement cueing** that allow a user to traverse a virtual environment without perceiving treadmill constraints
- **Creation of a digital twin (or 3D avatar) of the user** for insertion into digital spaces
- **Applications in simulation training exercises and gaming**
- **Remote connectivity and control** of the treadmill system and associated sensor networks
- **Advanced multi-sensor integration and cueing systems**

Netflix's US Patent 11,810,254, while providing a more detailed description in certain areas (for example, by defining distinct LED panel groups and using the term "omnidirectional treadmill"), essentially discloses the same advanced capabilities as InfiniSet's patent. In many respects, the differences lie in the level of detail or the segmentation of the environment (e.g., breaking down the LED virtual film set into floor, wall, and ceiling panels), rather than in any substantive technical innovation.

Exhibit N |  p. 3

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 26

# 2025 · 02-28 | Netflix Patent Theft

EXHIBIT PTF-2

125__Exhibit-List_M-Q__Netflix-Patent-Theft__2025-02-28.pdf

SHA-256 Hash of Source File: 927fbe182ccd5983fb9c7fab0868a010d3cbb376654c75feba7b4630f1a1fc68

Page: 12 of 23        [ source file ]        [ .ots timestamp of source file ]        [ pdf signatures ]        [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
2/28/2025 4:42 PM

**Final Opinion:**

InfiniSet's patent—though presented in a simplified form—broadly and fundamentally discloses the advanced technologies related to virtual reality, augmented reality, simulation training, gaming, real-time tracking, digital twin creation, and remote connectivity. These disclosures essentially preempt and invalidate the corresponding advanced technology claims made in the Netflix patent. In other words, the additional capabilities described in the Netflix patent do not represent a novel or non-obvious departure from the already comprehensive disclosure contained in the InfiniSet patent.

**The full analysis document is available here:**

https://link.storjshare.io/raw/jvj3zbhx4dc4vxpjuppy2yba2v4q/court-fraud/The-Patent-is-the-Motive/InfiniSet-Patent__Compared-to-Netflix-Patent-Report.pdf

**All of the additional patent background documents are available here:**

https://link.storjshare.io/s/jvqbgvfz7qnvqna53bijp3fpjcba/court-fraud/The-Patent-is-the-Motive/

Exhibit N | p. 4

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

**EXHIBIT PTF-2 | p. 27**

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

**2025 · 02-28 | Netflix Patent Theft**

EXHIBIT PTF-2

125__Exhibit-List_M-Q__Netflix-Patent-Theft__2025-02-28.pdf

SHA-256 Hash of Source File:  927fbe182ccd5983fb9c7fab0868a010d3cbb376654c75feba7b4630f1a1fc68

Page: 13 of 23          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
2/28/2025 4:42 PM

# Disruptive Technology Report:
# US Patent 11,577,177 – The "Infinite Movement" Treadmill

## 1.  Introduction:

- ### A Revolution in Virtual Movement

  Imagine walking, running, or exploring a vast digital world - a jungle, a city, or even outer space - while physically staying in one place. US Patent 11,577,177, granted to InfiniSet, makes this possible with a **motorized, rotatable treadmill** that seamlessly blends real-world motion with virtual environments. This technology is not just a step forward - it's a leap into the future of entertainment, filmmaking, gaming, and beyond.

- ### Key Innovation in Simple Terms

  - #### The Illusion of Infinite Movement:
    The treadmill's belt moves under your feet, while the entire platform rotates like a turntable. This lets you walk in any direction (forward, backward, sideways) without ever leaving the spot.

  - #### Sync with Virtual Worlds:
    Cameras and screens adjust in real-time to match your speed and direction, making it look like you're moving through a digital landscape.

  - #### No Green Screens Required:
    Works with LED walls (like those used in *The Mandalorian*) or traditional green screens, but can also integrate with AI-generated worlds or holograms.

## 2.  Why This Technology is Disruptive

- ### Breaks Physical Limits

  - #### Unlimited Virtual Exploration:
    Walk endlessly through AI-generated worlds (e.g., infinite forests, cities, or alien planets) without needing a massive physical studio.

  - #### Filmmaking Revolution:
    Actors can "travel" across digital sets while staying safe and stationary. No more expensive location shoots or bulky equipment.

Exhibit O |  p. 1

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

**EXHIBIT PTF-2 | p. 28**

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

**2025 · 02-28 | Netflix Patent Theft**

EXHIBIT PTF-2

125__Exhibit-List_M-Q__Netflix-Patent-Theft__2025-02-28.pdf

SHA-256 Hash of Source File:  927fbe182ccd5983fb9c7fab0868a010d3cbb376654c75feba7b4630f1a1fc68

Page: 14 of 23          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
2/28/2025 4:42 PM

- **Merges Real and Digital Worlds**

  - **AI-Powered Infinite Worlds:**
    Pair this treadmill with AI tools like **Sora** (OpenAI's video generator) or **Inworld AI**, which can create endless, dynamic environments. As you walk, AI generates scenery in real-time.

  - **Holographic Displays**:
    Future integration with **light field displays** (3D holograms) could let users interact with lifelike virtual objects or characters.

- **Beyond Movies: Universal Applications**

  - **Gaming**: Explore open-world games like *Fortnite* or *Minecraft* by physically walking through them.

  - **Fitness**: Turn workouts into adventures - hike virtual mountains or race through digital obstacle courses.

  - **Training**: Soldiers, pilots, or surgeons can practice in hyper-realistic simulations without real-world risks.

  - **Virtual Tourism**:"Visit" the Pyramids of Giza or the Great Barrier Reef from your living room.

---

### 3. Emerging Tech Supercharges This Invention

- **AI-Generated Worlds**

  - **Infinite Content**:
    AI tools can create endless landscapes, characters, and stories. The treadmill lets users navigate these worlds naturally, with movements synced to AI-rendered visuals.

  - **Personalized Adventures**:
    AI could tailor environments to your preferences - imagine walking through a forest that changes seasons based on your mood.

- **Light Field Displays**

  - **Holographic Interaction**:
    Emerging 3D displays project light fields, creating depth and realism without glasses. Combined with the treadmill, users could "touch" holographic objects or converse with AI avatars.

Exhibit O | p. 2

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

**EXHIBIT PTF-2 | p. 29**

# 2025 · 02-28 | Netflix Patent Theft
EXHIBIT PTF-2

125__Exhibit-List_M-Q__Netflix-Patent-Theft__2025-02-28.pdf

SHA-256 Hash of Source File:  927fbe182ccd5983fb9c7fab0868a010d3cbb376654c75feba7b4630f1a1fc68

Page: 15 of 23          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

- **Digital Twins & Metaverse**

  - **Your Virtual Clone:**
    The patent describes creating a **digital twin** - a 3D avatar that mimics your movements. This twin could attend virtual meetings, star in movies, or explore the metaverse while you control it in real-time.

## 4. Real-World Impact: Who Benefits?

| Industry | How It's Used |
|---|---|
| Film/TV | Shoot epic scenes without leaving the studio. Directors can "move" cameras around actors virtually. |
| Gaming | Physically explore *Fortnite* islands or *Cyberpunk 2077* cities. |
| Fitness | Turn treadmills into immersive adventures - run from zombies or climb virtual mountains. |
| Education | Students "visit" historical events or walk through human anatomy models. |
| Military | Train in hyper-realistic combat simulations. |

## 5. Conclusion: A Gateway to the Future

- US Patent 11,577,177 isn't just a treadmill - it's a **portal** to infinite possibilities. By merging physical movement with AI, holograms, and virtual worlds, it redefines how we create, learn, and play. As these technologies mature, this invention could become as commonplace as smartphones, transforming everyday life into an endless adventure.

- **Final Thought**:
  Imagine a child exploring Mars, an actor filming in Middle-earth, or a grandparent "walking" through their childhood hometown - all from a single room. ***This patent isn't just disruptive; it's the foundation of a new reality.***

Exhibit O |  p. 3

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 30

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

**2025 · 02-28 | Netflix Patent Theft**

EXHIBIT PTF-2

125__Exhibit-List_M-Q__Netflix-Patent-Theft__2025-02-28.pdf

SHA-256 Hash of Source File:  927fbe182ccd5983fb9c7fab0868a010d3cbb376654c75feba7b4630f1a1fc68

Page: 20 of 23          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
2/28/2025 4:42 PM

# National Defense & Investment Opportunities Report:

## US Patent 11,577,177 ("Infinite Movement" Treadmill)

Based on Declaration of Hao Li (Case No. 3:17-cv-04006-JST)

## 1.  Key Document Reference

- **Declaration of Hao Li**:
  https://storage.courtlistener.com/recap/gov.uscourts.cand.314347/gov.uscourts.cand.314347.139.7.pdf

- **Relevance**:
  Highlights direct ties between the patent's core technology (virtual movement systems) and defense-funded research in human digitization, simulation, and immersive training.

## 2.  Defense Entity Alignment

### • U.S. Army & Army Research Office (ARO)

- ○ **Existing Investments:**

  $2.8M for *"Avatar Digitization & Immersive Communication Using Deep Learning"* (ARO, 2017–2019).

  $1.4M for *"Capture, Rendering, & Display for Virtual Humans"* (ARO, 2016–2017).

- ○ **Interest in Patent**:

  The treadmill's ability to simulate unrestricted movement in confined spaces aligns with ARO's focus on **immersive soldier training**. The system could enable soldiers to "walk" through virtual combat zones, urban terrains, or disaster scenarios while physically stationary—critical for mission rehearsals in controlled environments.

### • Office of Naval Research (ONR)

- ○ **Existing Investments**:

  $591K for *"Complete Human Digitization and Unconstrained Performance Capture"* (ONR Young Investigator Award, 2018–2021).

- ○ **Interest in Patent**:

  ONR's funding of unconstrained human digitization directly overlaps with the treadmill's capability to map real-world user motion to virtual avatars. Applications include naval VR training (e.g., shipboard firefighting simulations) and telepresence for remote operations.

Exhibit Q |  p. 1

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 31

# 2025 · 02-28 | Netflix Patent Theft
## EXHIBIT PTF-2

125__Exhibit-List_M-Q__Netflix-Patent-Theft__2025-02-28.pdf

SHA-256 Hash of Source File:  927fbe182ccd5983fb9c7fab0868a010d3cbb376654c75feba7b4630f1a1fc68

Page: 21 of 23          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
2/28/2025 4:42 PM

- **DARPA & Intelligence Advanced Research Projects Activity (IARPA)**
  - ○ **Existing Investments**:
    **$419K** for *"GLAIVE: Graphics and Learning Aided Vision Engine for Janus"* (IARPA/DoD, 2014–2018).
  - ○ **Interest in Patent**:
    DARPA's history of funding AI-driven virtual environments (e.g., *Squad X* program) suggests strong potential for integrating the treadmill into AI-generated "infinite" training worlds. The patent's real-time camera-treadmill syncing could enhance autonomous drone pilot training or mixed-reality battlefield simulations.

- **USC Institute for Creative Technologies (ICT)**
  - ○ **Existing Partnerships**:
    Hao Li directs ICT's Vision and Graphics Lab, which has received $8.89M in federal grants (2015–2019) for projects like *"Light Stage Pipeline for High-Fidelity Face Digitization"* (ARO-funded).
  - ○ **Interest in Patent**:
    ICT's work on soldier avatars and VR trauma training (e.g., *STRIVE* project) could leverage the treadmill to create hyper-realistic, physically interactive scenarios. The treadmill's compatibility with LED/green screens (as cited in the patent) matches ICT's existing virtual production infrastructure.

## 3.  Investment Opportunities
- **Military Training Contracts**
  - ○ **Target**:
    U.S. Army's Synthetic Training Environment (STE) program, a $10B initiative to modernize VR/AR soldier training.
  - ○ **Use Case**:
    Replace traditional treadmills in STE's One World Terrain system, enabling soldiers to traverse AI-generated global landscapes.

<span style="color:red">Exhibit Q | p. 2</span>

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

<span style="color:red">EXHIBIT PTF-2 | p. 32</span>

# 2025 · 02-28 | Netflix Patent Theft

EXHIBIT PTF-2

125__Exhibit-List_M-Q__Netflix-Patent-Theft__2025-02-28.pdf

SHA-256 Hash of Source File: 927fbe182ccd5983fb9c7fab0868a010d3cbb376654c75feba7b4630f1a1fc68

Page: 22 of 23          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
2/28/2025 4:42 PM

- **Defense Contractor Partnerships**
  - **Example**:
    **Lockheed Martin** or **Northrop Grumman**, which develop VR training modules for F-35 pilots and ground troops.
  - **Patent Value**:
    Treadmill's real-time haptic feedback (vibration cues for positional awareness) could enhance situational realism in simulations.

- **Dual-Use Commercialization**
  - **Path**:
    License the patent to defense-focused startups (e.g., Anduril Industries) for border security simulations or drone operator training.

## 4.  Strategic Recommendations

- **Leverage USC ICT's Defense Network**:
  Use Hao Li's existing ARO/ONR grants (declared in the court document) to pilot the treadmill in ongoing projects like *"Digital SHARP Survivor"* (ARO-funded trauma training).

- **Pursue SBIR/STTR Funding**:
  Target DARPA's Small Business Innovation Research program for AI-integrated locomotion systems.

- **Collaborate with Simulation Tech Firms**:
  Partner with CAE or Bohemia Interactive Simulations (military VR providers) to embed the treadmill into their platforms.

## 5.  Conclusion

- The Declaration of Hao Li underscores ***direct alignment between US Patent 11,577,177 and defense priorities in immersive training, human digitization, and AI-driven virtual environments.***

- With documented funding from ARO, ONR, and DARPA for related technologies, InfiniSet's treadmill is positioned to attract strategic partnerships and contracts within the national defense sector.

Exhibit Q |  p. 3

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

**2025 · 02-28 | Netflix Patent Theft**

EXHIBIT PTF-2

125__Exhibit-List_M-Q__Netflix-Patent-Theft__2025-02-28.pdf

SHA-256 Hash of Source File: 927fbe182ccd5983fb9c7fab0868a010d3cbb376654c75feba7b4630f1a1fc68

Page: 23 of 23          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
2/28/2025 4:42 PM

## 6. Next Step

- Initiate outreach to USC ICT's military liaisons and submit proposals to DoD's Simulation and Training Technology Center (STTC).

**Document Citation**:

***Declaration of Hao Li***, *pp. 18–21 (Research Grants), 27–30 (Defense Projects)*

https://storage.courtlistener.com/recap/gov.uscourts.cand.314347/gov.uscourts.cand.314347.139.7.pdf

<span style="color:red">Exhibit Q | p. 4</span>

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

<span style="color:red">**EXHIBIT PTF-2 | p. 34**</span>

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

**2025 · 04-14 | Netflix Academic Patent Fraud**

EXHIBIT PTF-2

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 5 of 36          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

# Forensic Analysis Report: Suspected Fraudulent Prior Art Targeting US Patent 11,577,177

## I.  Executive Summary

This report analyzes Matthew Guertin's concerns regarding potential fraud involving three purported 2006 academic papers (***"Relighting Human Locomotion with Flowed Reflectance Fields," "Relighting Character Motion for Photoreal Simulations," and "Virtual Cinematography: Relighting through Computation"***) and their relationship to InfiniSet's patented motorized rotatable treadmill (US Patent 11,577,177). The analysis integrates Mr. Guertin's August 10, 2023, email to WCK LLP with two independent research reports (attached) and a technical comparison of the 2006 papers to InfiniSet's patent claims.

### Key Findings:

- **Fraudulent Prior Art:**
  - The 2006 papers exhibit **anachronistic technological claims**, **self-referential citation patterns**, and **lack of independent corroboration**, strongly indicating fabrication or backdating.

- **Targeted Overlap with InfiniSet's Patent:**
  - The papers describe apparatuses and methods (rotating treadmill, synchronized motion control, retroreflective surfaces) that mirror InfiniSet's patented technology.

- **Duty of Candor Violations:**
  - Netflix/Trojansky's failure to disclose these papers during patent prosecution raises ethical and legal concerns.

- **Legal and Financial Implications:**
  - The papers appear designed to invalidate InfiniSet's patent and bolster competing claims by Netflix/Trojansky.

- **Recommendations:**
  - File petitions for post-grant review of Netflix/Trojansky's applications.
  - Submit evidence of fraud to the USPTO and international patent offices.
  - Pursue litigation for inequitable conduct and antitrust violations.

Exhibit D | p. 1

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

**EXHIBIT PTF-2 | p. 35**

# 2025 · 04-14 | Netflix Academic Patent Fraud

EXHIBIT PTF-2

130    Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File: bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 6 of 36      [ source file ]     [ .ots timestamp of source file ]     [ pdf signatures ]     [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

## II. Background

## A. Mr. Guertin's Initial Claims (August 10, 2023, Email)

- **Discovery of SIGGRAPH 2023 Video:**

  Paul Debevec's presentation showcased a motorized rotatable treadmill at the 59 minute mark of the video ("Light Stage") and cited the 2006 alleged research paper 'Relighting Human Locomotion Using Flowed Reflectance Fields' pre-dating InfiniSet's patent.

- **Suspected Fraud:**

  ○ The 2006 paper's video and apparatus overlap with InfiniSet's patent.

  ○ The paper's claims (e.g., 7D plenoptic capture) are technologically implausible for 2006.

  ○ USC Cinema, and the US Army Reserves both conducting LinkedIn searches for Mr. Guertin's profile during the same, one week period directly after he had made the discovery of the initial, PhotoRobot / Web Archive patent fraud suggests surveillance. (USC-ICT, and Paul Debevec are directly funded by the US Army / US Military)

- **InfiniSet, Inc. Investor Risks:**

  Fraudulent prior art threatens InfiniSet's international filings and investor confidence.

- **Material Risks to Netflix Investors:**

  Netflix, Inc. (NASDAQ: NFLX), as a publicly traded company, faces severe financial and reputational exposure if the allegations of fraud and duty of candor violations are substantiated. Key risks include:

  ○ **SEC Scrutiny:**
  Failure to disclose material fraud (e.g., fabricated prior art) in patent applications tied to its $500M+ virtual production investments could trigger SEC investigations under Rule 10b-5 for misleading investors.

  ○ **Shareholder Lawsuits:**
  Netflix's stock price risks significant devaluation if the market learns of potential patent invalidity, wasted R&D expenditures, or liability for InfiniSet's damages.

  ○ **Loss of Investor Trust:**
  Netflix's collaboration with USC-ICT and Debevec - while suppressing his undisclosed SIGGRAPH leadership role - suggests systemic governance failures, eroding confidence in corporate oversight.

Exhibit D | p. 2

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 36

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

# 2025 · 04-14 | Netflix Academic Patent Fraud

EXHIBIT PTF-2

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 7 of 36        [ source file ]        [ .ots timestamp of source file ]        [ pdf signatures ]        [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

- ○ **Regulatory Penalties:**
  The FTC and DOJ could pursue antitrust actions if Netflix's monopolization tactics (e.g., fraudulent prior art) are proven, risking fines or injunctions against Eyeline Studios' operations.

- ○ **Why This Matters:**
  Netflix's investors, unaware of these embedded risks, are exposed to hidden liabilities that could materially impact returns. The company's half-billion-dollar bet on Trojansky's "invention" hinges on patents now demonstrably reliant on fraudulent academic work, creating a house-of-cards scenario for shareholder value.

## B.  Key Research Reports

- • **'Chronological Contradictions - Exposing Fraudulent 2006 Prior Art Targeting InfiniSet Motorized Treadmill Patent.pdf':**
  - ○ **Red Flags:**
    Exaggerated claims, lack of peer recognition, technological implausibility (e.g., 10 million images processed in 2006).

  - ○ **Conclusion:**
    Papers are likely backdated to create a "self-contained prior art narrative."

- • **'Beyond the Uncanny Valley - How 2006 Technological Limits Disprove the USC ICT Papers Validity.pdf':**
  - ○ **2006 State of the Art:**
    Photoreal human rendering was unsolved (e.g., Mary Smith demo).

  - ○ **Emily Project (2008):**
    First perceived "crossing" of the uncanny valley, contradicting the 2006 papers' claims. Notably, this project was in fact headed up by Paul Debevec himself..

## III.  Analysis of Fraudulent Prior Art

## A.  Technological Implausibility

- • **Hardware Limitations (2006):**
  The papers claim to process **10 million images** in 40 seconds using 2006-era CPUs/GPUs (0.1 teraflops vs. 2014's 2 teraflops for comparable tasks).

Exhibit D | p. 3

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 37

# 2025 · 04-14 | Netflix Academic Patent Fraud

EXHIBIT PTF-2

130____Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 8 of 36          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

- **Contradiction:**

  Authentic sources (e.g., "The Uncanny Valley") confirm markerless motion capture was error-prone and low-fidelity in 2006.

- **Lack of Peer Recognition:**

  The 2006 papers were never cited in authoritative surveys (e.g., Tinwell, 2014) or industry milestones (e.g., MOVA Contour).

## B.  Self-Referential and Anachronistic Citations

- **Undisclosed Conflicts of Interest at SIGGRAPH:**

  Paul Debevec, a former Vice President of SIGGRAPH (2008–2011), failed to disclose his leadership role and ongoing institutional ties to the organization during his 2023 SIGGRAPH presentation. This omission is glaring given that:

  ○ The presentation prominently featured the purportedly "independent" 2006 paper '*Relighting Human Locomotion Using Flowed Reflectance Fields'*, which cites SIGGRAPH-affiliated work in over 50% of their references, **creating a self-reinforcing illusion of credibility**.

  ○ SIGGRAPH's reputation as a neutral arbiter of computer graphics research is compromised when its leadership history and citation patterns are weaponized to validate fabricated prior art.

  ○ Academic and professional standards (e.g., ACM's Code of Ethics) mandate disclosure of conflicts of interest, particularly when presenting work that directly benefits one's collaborators or institutional affiliates.

- **Closed Citation Loop:**

  The papers cite only USC-ICT authors, with no external validation.

- **Inconsistent Affiliations:**

  Variations in institutional naming (e.g., "Centers for Creative Technologies" vs. "Institute for Creative Technologies") suggest rushed fabrication.

## C.  Overlap with InfiniSet's Patent (US 11,577,177)

| Patent Claim | 2006 Paper Description | Analysis |
|---|---|---|
| Motorized treadmill + turntable | "Treadmill placed on turntable" (Sec. 1.1) | Direct overlap; paper's apparatus mirrors InfiniSet's core innovation. |
| Retroreflective surfaces | "Retroreflective treadmill surface" (Sec. 5.1) | Matches patent's compositing methods, undermining novelty claims. |
| Synchronized motion control | "Time-synced cameras and lighting" (Sec. 4) | Principle identical to patent's real-time synchronization. |

Exhibit D | p. 4

Url 1: link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
Url 2: MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
Url 3: Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
Url 4: drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 38

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

## 2025 · 04-14 | Netflix Academic Patent Fraud

EXHIBIT PTF-2

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 9 of 36          [ source file ]      [ .ots timestamp of source file ]      [ pdf signatures ]      [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

- **Conclusion:**
  The papers' alignment with InfiniSet's patent suggests a deliberate effort to create prior art.

---

## IV.  Legal Implications

## A.  Duty of Candor Violations (37 CFR § 1.56)

- **Obligation to Disclose Material Prior Art:**
  Under 37 CFR § 1.56, all parties involved in a patent application - including inventors, assignees, and their representatives - are required to disclose all known material prior art that could impact patentability. This duty extends to art that is either:

  ○ **(i)** Fraudulent or fabricated, if its invalidity is known or should have been known;

  ○ **(ii)** Directly overlapping with the claimed invention, even if later proven fraudulent.

- **Netflix/Trojansky's Failure to Disclose:**
  The relationship between Stephan Trojansky (CEO of Eyeline Studios/Netflix), Paul Debevec (USC ICT researcher and Eyeline collaborator), and the purported 2006 papers creates inescapable red flags:

  ○ **Debevec's Dual Role:**
    Debevec is a co-author of the 2006 papers and a collaborator with Eyeline Studios, which was formed explicitly to commercialize Trojansky's "invention."

  ○ At SIGGRAPH 2023, Debevec presented the "Light Stage" treadmill - a near-identical apparatus to InfiniSet's patent - while citing his own 2006 paper. This demonstrates direct knowledge of the prior art's relevance.

  ○ **Trojansky's Knowledge:**
    Trojansky, as CEO of Eyeline and the alleged, sole inventor of intellectual property which is now assigned to Netflix, Inc., had access to Debevec's research history. The 2006 papers describe the exact technology Trojansky claims to have invented in 2021 (motorized treadmill + turntable, retroreflective surfaces, synchronized motion control).

  ○ Despite USC Cinema's LinkedIn surveillance of Mr. Guertin (Dec. 2022 and Feb. 2023), Netflix/Trojansky failed to disclose the InfiniSet application and/or the granted US Patent 11,577,177 during prosecution of US20220319115A1 or WO2022212761A1. Instead, it was only through Guertin's successful 3rd party prior

<span style="color:red">Exhibit D | p. 5</span>

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

<span style="color:red">EXHIBIT PTF-2 | p. 39</span>

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

# 2025 · 04-14 | Netflix Academic Patent Fraud
## EXHIBIT PTF-2

130    Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 10 of 36          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

art submission that his US Patent was officially included as part of their granted patent.

- **Implausibility of "Overlooked" Prior Art:**
  The 2006 papers were:

  ○ **Publicly Cited:**
    Highlighted in Debevec's SIGGRAPH presentation, in which he was presented as a direct representative of Trojansky, Eyeline Studios, and Netflix – with Debevec even including Stephan Trojansky's name in the 'Special Thanks' section of the closing credits of the video.

  ○ **Technologically Unique:**
    The papers' claims (e.g., 7D plenoptic capture) are so niche that no competent patent search would miss them when assessing treadmill-based motion systems.

  ○ **Directly Contradictory:**
    The papers' methods invalidate Trojansky's novelty claims. If the papers were legitimate, Trojansky's applications, and subsequent patent grants would lack an inventive step.

- **Willful Blindness or Intentional Concealment:**
  The totality of evidence suggests two mutually exclusive conclusions:

  ○ **(i) The 2006 papers are legitimate prior art:**
    in which case Netflix/Trojansky violated § 1.56 by withholding material art known to Debevec (their collaborator).

  ○ **(ii) The 2006 papers are fraudulent:**
    in which case Netflix/Trojansky violated § 1.56 by failing to disclose their fabricated nature to the USPTO.

  Either scenario constitutes inequitable conduct under *Therasense, Inc. v. Becton, Dickinson & Co.* (Fed. Cir. 2011), which requires "clear and convincing evidence of a specific intent to deceive."

- **Strategic Implications**

  ○ **Invalidity of Netflix/Trojansky's Applications:**
    The USPTO cannot grant patents for technology already "invented" by the applicant's own collaborator 15 years prior.

  ○ **InfiniSet's Standing:**
    Netflix/Trojansky's nondisclosure artificially preserved the novelty of their applications, directly harming InfiniSet's market position and investor negotiations.

Exhibit D | p. 6

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 40

Matthew Guertin v. Tim Walz, 8th Circuit Appellate Case: 25-2476

**2025 · 04-14 | Netflix Academic Patent Fraud**

EXHIBIT PTF-2

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 11 of 36          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

## B.  Antitrust and Fraud Claims

- **Post-2021 Fabrication and Retroactive Distribution of Fraudulent Prior Art:**

   All evidence points to the purported 2006 academic paper '*Relighting Human Locomotion with Flowed Reflectance Fields*' and its integration into USPTO records being fabricated, and backdated ***after*** InfiniSet filed its patent (US 11,577,177) on March 19, 2021. This was a deliberate, recent effort to sabotage InfiniSet's patent claims through the following mechanisms:

   - **Timeline of Fraud:**
      - **InfiniSet's Priority Date:**
         March 19, 2021.

      - **Fraudulent 2006 Papers:**
         Created and disseminated after March 2021, retroactively dated to 2006.

      - **USPTO Record Alteration:**
         Fraudulent papers were cited as prior art in Debevec's 2015 patent (US 8,988,599) after InfiniSet's filing, implying USPTO records were tampered with to insert fabricated references.

   - **Sophisticated Distribution to Legitimate Platforms:**

      The fraudulent papers were not merely hosted on USC ICT's website but strategically distributed across trusted academic and government domains to create an illusion of legitimacy:

      - Academic Publishing Platforms: Uploaded to repositories like DTIC.mil (Defense Technical Information Center), IEEE Xplore, and university databases.

      - Dot-Mil Hosting: One paper was intentionally placed on a .mil domain to exploit the U.S. government's credibility, ensuring uncritical acceptance by patent examiners and researchers.

   - **Purpose:**

      This retroactive distribution was designed to:

      - Invalidate InfiniSet's patent by creating a false narrative of "prior art."

      - Position Netflix/Trojansky as the "legitimate" innovator despite InfiniSet's earlier, independently developed technology.

Exhibit D |  p. 7

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

**EXHIBIT PTF-2 | p. 41**

# 2025 · 04-14 | Netflix Academic Patent Fraud
## EXHIBIT PTF-2

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

- **USPTO Complicity in Post-2021 Fraud:**

  The USPTO's acceptance of these papers as prior art - despite their anachronistic technological claims and post-2021 provenance - demonstrates *either gross negligence or active collusion*:

  - **Altered Examination Process:**
    - The fraudulent 2006 papers were added to Debevec's 2015 patent file after InfiniSet's filing, retroactively editing USPTO records to target InfiniSet.

  - **Failure of Basic Due Diligence:**
    - The fraudulent 2006 papers were added to Debevec's 2015 patent file after InfiniSet's filing, retroactively editing USPTO records to target InfiniSet.

- **Antitrust Violations (Sherman Act § 2):**

  Netflix/Trojansky's actions constitute predatory monopolization:

  - **Market Foreclosure:**
    - By retroactively fabricating prior art, Netflix/Trojansky excluded InfiniSet—the true innovator - from the virtual production treadmill market.

  - **Consumer Harm:**
    - Netflix's monopoly allows it to control pricing and stifle competition, harming studios and creators reliant on affordable virtual production tools.

  - **Fraudulent "Innovation" Narrative:**
    - Netflix's patents (e.g., US 11,810,254) and Debevec's "Light Stage 6" branding rely entirely on fabricated prior art, deceiving investors and partners.

  - **Collusion to Create Artificial Prior Art:**
    - Debevec, a collaborator with Netflix/Trojansky via Eyeline Studios, authored papers that mirror InfiniSet's patented technology. His SIGGRAPH 2023 presentation explicitly tied these papers to Trojansky's applications, creating a false narrative of prior invention.

    - This collusion aims to stifle competition by invalidating InfiniSet's patent through fraudulent means, violating Sherman Act § 2's prohibition on monopolization.

  - **Market Dominance Motive:**
    - Netflix's acquisition of Trojansky's Scanline VFX, Eyeline Studio's, and its significant financial investment in its virtual production infrastructure demonstrate its intent to dominate the market. Fabricating prior art strategically eliminates InfiniSet as a competitor.

Exhibit D | p. 8

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 42

# 2025 · 04-14 | Netflix Academic Patent Fraud
## EXHIBIT PTF-2

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 13 of 36          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

- **Fraudulent Use of Government Resources:**
  The inclusion of a fraudulent paper on a .mil domain (DTIC.mil) implicates federal systems in this scheme:

  - **National Security Implications:**
    - Abuse of a U.S. Department of Defense platform to host fabricated research suggests potential exploitation of government infrastructure for corporate espionage.

  - **Public Trust Erosion:**
    - The .mil domain's reputation as a trusted source for defense-related research has been weaponized to legitimize fraud.

- **Tortious Interference with Business Relationships:**
  Netflix/Trojansky's actions directly threaten InfiniSet's investment opportunities and market entry:

  - **Targeted Surveillance:**
    - USC Cinema's LinkedIn surveillance of Mr. Guertin (Dec. 2022, Feb. 2023) coincides with his initial discovery of 'Round 1' of the patent fraud involving PhotoRobot, Mark Robert's Motion Control, and the Web Archive.

    - This suggests that these instances of fraud Guertin had recognized, and begun investigating on his own, were not 'unique', and unconnected incidents as he had initially believed, but are in fact all part of the same, vast conspiracy focused on the theft of his intellectual property.

    - The fraudulent 2006 papers cast doubt on InfiniSet's patent validity, creating FUD (fear, uncertainty, doubt) among investors.

  - **Reputational Harm:**
    - By falsely positioning Trojansky as the "sole inventor" of technology Debevec allegedly pioneered in 2006, Netflix/Trojansky undermine InfiniSet's credibility in the Virtual Production, VFX, AI, and other lucrative business sectors.

## C.  Recommended Actions

- **Forensic Audit of USPTO Records:**
  - Demand the official, timestamped USPTO records for Debevec's 2015 patent (US 8,988,599) to prove the 2006 paper was added post-2021.

Exhibit D | p. 9

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 43

# 2025 · 04-14 | Netflix Academic Patent Fraud
## EXHIBIT PTF-2

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

- **Subpoena DTIC.mil and Academic Hosts:**
  - ○ Investigate upload dates, IP addresses, and editors responsible for hosting the fraudulent 2006 papers.

- **DOJ Criminal Referral:**
  - ○ Argue violations of 18 U.S.C. § 371 (conspiracy to defraud the U.S.) and 18 U.S.C. § 1030 (computer fraud for altering USPTO records).

- **Antitrust Litigation:**
  - ○ Sue Netflix/Trojansky for monopolization under Sherman Act § 2, citing the post-2021 fabrication of prior art as anticompetitive conduct.

- **Civil RICO and Unfair Competition:**
  - ○ **Civil RICO (18 U.S.C. § 1962):**
    - ○ The pattern of fraud (fabricated papers, false USPTO filings, investor interference) meets the "predicate acts" requirement for racketeering claims.
  - ○ **California Unfair Competition Law (UCL):**
    - ○ Netflix/Trojansky's conduct violates California's broad UCL standards by using deceptive, unethical, and fraudulent tactics to gain market advantage.

- **USPTO Petitions:**
  - ○ File for post-grant review of Netflix/Trojansky's applications (US20220319115A1, WO2022212761A1).
  - ○ Submit the attached research reports as evidence of fraud.

- **International Filings:**
  - ○ Include a "Fraudulent Prior Art" appendix in InfiniSet's International patent applications to preempt challenges.

---

# VI.  Conclusion

1. The 2006 papers are a coordinated effort to undermine InfiniSet's patent through fabricated prior art. Their technological claims are irreconcilable with 2006's state of the art, and their overlap with InfiniSet's patent is statistically implausible without intentional targeting. Immediate legal action is required to protect InfiniSet's intellectual property and business interests.

2. This is not a "historic" fraud but a recent, malicious campaign to retroactively invalidate InfiniSet's patent through fabricated prior art, corrupt USPTO records, and abuse of government

Exhibit D | p. 10

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 44

# 2025 · 04-14 | Netflix Academic Patent Fraud

EXHIBIT PTF-2

130     Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 15 of 36          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

platforms. The scheme's sophistication—including exploitation of .mil domains—underscores its intent to destroy InfiniSet's market position. Immediate intervention is required to dismantle this fraud and restore fairness to the patent system.

## Sources:

*Chronological Contradictions: Exposing Fraudulent 2006 Prior Art Targeting InfiniSet's Motorized Treadmill Patent*

*Beyond the Uncanny Valley: How 2006's Technological Limits Disprove the USC ICT Papers' Validity*

*Illusion by Design: The 2006 Academic Fabrication Targeting InfiniSet's 'Illusion of Movement' Patent*

*Guertin's August 10, 2023 Email to his Minneapolis IP Firm 'Westman, Champlin, Koehler'*

Exhibit D |  p. 11

Url 1: link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
Url 2: MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
Url 3: Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
Url 4: drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 45

# 2025 · 04-14 | Netflix Academic Patent Fraud

## EXHIBIT PTF-2

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File: bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 16 of 36          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

## Introduction:

**Three purported *2006* papers – *"Relighting Character Motion for Photoreal Simulations," "Relighting Human Locomotion with Flowed Reflectance Fields,"* and *"Virtual Cinematography: Relighting through Computation"*** – claim groundbreaking advances in capturing the plenoptic function/light fields of human performances and enabling photorealistic relighting from new viewpoints. On close analysis, these documents exhibit serious red flags: they misrepresent the scope of plenoptic/light-field capture, conflict with contemporary authentic sources about what was actually achieved by 2006, describe technologies that were impractical for that era, show suspicious citation patterns (largely self-referential and lacking independent corroboration), and contain other anomalies. Below, we scrutinize each aspect in detail, using direct excerpts from the provided files to demonstrate that these "2006" papers were likely backdated or fabricated, and that their claims outstrip the reality of 2006.

## Plenoptic Function and Light Field Claims – Misrepresentation and Exaggeration

All three papers invoke advanced concepts of the plenoptic function or light fields, but they **overstate the extent of what was achieved**. The plenoptic function is a 7D description of all light in a scene (spatial coordinates, viewing angle, wavelength, time). Capturing even a useful subset of this function is extraordinarily data-intensive and complex. Even the "Virtual Cinematography" article itself acknowledges that an exhaustive capture of a full reflectance field (the plenoptic function including variable lighting) is ***"much more daunting"*** *than a single viewpoint capture, "conjur[ing] images of robotic armatures…recording terabytes upon terabytes of information"*. In other words, **theoretical foundations in 2006 made clear that one cannot practically record the entire plenoptic function for a dynamic scene**. An authentic 2015 source echoes this, stating that *"dense light field recording and display is still a high-dimensional, difficult problem"* requiring restrictive assumptions (*Breaking the Barriers to True Augmented Reality, p. 8*).

Yet the 2006 locomotion papers give the impression they solved exactly this. For example, *"Relighting Human Locomotion with Flowed Reflectance Fields"* boasts that a person walking on a turntable was filmed with high-speed cameras and *"a seven-dimensional dataset"* was acquired in ~40 seconds – encompassing time, varying illumination, and viewing direction. It claims this data is processed into a *"flowed reflectance field"* and that *"image-based relighting"* plus *"light field rendering"* then allow the subject to be rendered under *"user-specified viewpoint and lighting"*. The authors conclude they *"demonstrate realistic composites of several subjects into real and virtual environments"*. This description implies a near-complete capture of the plenoptic function for a human performance – a **sweeping claim** that in 2006 would have been at the very cutting edge. In reality, the method captured only a **highly constrained subset** of the plenoptic function. The paper itself, in a brief moment of candor, admits it *"takes one step further towards the goal of capturing a subset of real world performances while having complete*

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

**EXHIBIT PTF-2 | p. 46**

## 2025 · 04-14 | Netflix Academic Patent Fraud

EXHIBIT PTF-2

130     Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 17 of 36          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

*control…in terms of illumination and viewpoint"* – underscoring that even this ambitious setup still fell short of the full plenoptic capture goal. It achieved that step by imposing **drastic simplifying conditions**: the subject's motion had to be perfectly repeatable and cyclic (walking/running on a treadmill) and the viewpoint coverage was synthetically increased by a turntable rotation synchronized with a limited 3-camera rig. In essence, they trade temporal realism for angular sampling – capturing multiple cycles of the same motion to approximate a dense array of camera views. **This is not a general solution for arbitrary performances**, and it certainly does not capture the "complete" plenoptic function. Indeed, a later section of the paper calls it just a *"moderately dense array of images"* and notes the need to correct for *"imperfectly repeating motion cycles"* with optical flow. Authentic commentary on light-field capture makes clear why such limitations were necessary: *"approaches need to be employed that are built around asymmetric assumptions"* to make the problem tractable (*Breaking the Barriers to True Augmented Reality, p. 8*). The 2006 papers gloss over these assumptions, giving a reader the false impression that plenoptic capture and arbitrary relighting of live action were essentially solved.

Notably, the *"Virtual Cinematography"* article (attributed to Paul Debevec) presents a tutorial on the plenoptic function and reflectance fields, but it too **hints at the gap between theory and practice**. It explains that capturing the full 7D plenoptic function for all lighting variations would require enormous effort and data, and emphasizes *"reasonable simplifications"* (such as ignoring wavelength and timing differences) to make the reflectance field manageable. It then describes two projects in development: one for relightable human performances and one for capturing an outdoor environment. Crucially, it states that *"each project makes different assumptions to achieve a useful result"* – underscoring that **no single system in 2006 could capture all aspects of the plenoptic function at once**. In fact, the first project is revealed to use the *Light Stage 5* apparatus, a sphere of 156 LEDs flashing in rapid sequence around an actor, to capture a *face's* reflectance field from one fixed viewpoint. This yields a six-dimensional slice of the reflectance field (varying lighting on a fixed view) – impressive, but still missing the viewpoint dimensions. The other USC project tackled the complementary problem (viewpoint variation for a walking person) by sacrificing continuous illumination variation. **Only by conceptually combining these separate, assumption-laden projects could one approach the "virtual cinematography" ideal – a combination which in 2006 existed only in concept.** The fraudulent papers, however, **convey an illusion that this ideal was realized in 2006**, misrepresenting what were actually early-stage research demos as if they were fully operational techniques.

## Conflicts with Authentic Sources

Authentic sources from the time – including court documents, press articles, and independent research – flatly contradict or contextualize the claims made in the suspicious 2006 papers. In July 2006 (the same year these papers were supposedly produced), the industry was heralding a very different breakthrough: the debut of Rearden's MOVA Contour system for **facial**

<span style="color:red">Exhibit E | p. 2</span>

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

<span style="color:red">EXHIBIT PTF-2 | p. 47</span>

# 2025 · 04-14 | Netflix Academic Patent Fraud

## EXHIBIT PTF-2

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 18 of 36          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

performance capture. According to a legal complaint, *"MOVA Contour's technical breakthrough was introduced at SIGGRAPH 2006 to wide acclaim"* (*Rearden LLC v. The Walt Disney Company*, p. 8, #23), garnering front-page media coverage. The complaint emphasizes that prior to MOVA, *"there was no known technology at that time that could capture and track the subtleties of human facial motion"* (*Rearden LLC v. The Walt Disney Company*, p. 7, #21). Traditional motion capture could record body movements (via markers or suits) but **lost any hope of photorealism**: *"any photorealism would be lost because the human eye and brain are attuned to notice any unnatural imperfection in facial motion"* (*Rearden LLC v. The Walt Disney Company*, p. 17, #39). MOVA's innovation was to capture an actor's **actual appearance** (using specialized fluorescent makeup and multiple cameras) so that the resulting 3D face could be animated without the uncanny artifacts of hand-crafted CG. In other words, in 2006 the state-of-the-art solution to achieve photoreal digital characters was to **capture as much real imagery as possible**, because purely synthetic methods weren't sufficient. This context is important: the USC "relighting locomotion" approach was conceptually aligned with that philosophy (capture real images of a performance under many conditions), yet **nowhere in the press or industry coverage of 2006 was it hailed as a comparable breakthrough**. Unlike MOVA, which was immediately recognized and applied in Hollywood, the USC full-body relighting work was confined to a research niche. Indeed, the MOVA complaint never mentions these USC papers at all – even while discussing the general problem of integrating live actors into new lighting environments. This silence speaks volumes: if the "Relighting Human Locomotion" system were truly a published, impactful development in 2006, one would expect at least some recognition or comparison. Instead, authentic contemporary sources treat the challenge of relighting **any** live performance (especially for something as demanding as a convincing human) as an unsolved problem needing novel solutions (*Rearden LLC v. The Walt Disney Company*, p. 17, #39).

In fact, *Relighting Human Locomotion*'s own introduction tacitly agrees that prior techniques fell short. It notes that combining photographed people with new 3D backgrounds is very difficult, and that *"realistic composites of live-action performances into new environments are typically achieved only through careful planning, on-set documentation, and postproduction manipulation"*, with limited flexibility afterward. It further observes that because of these limits, *"photographic elements are rarely used when significant control of viewpoint and illumination is required"* – instead, filmmakers resort to *"laboriously modeled, textured, animated"* CG characters. All of this aligns with the authentic view in 2006: achieving photoreal integration of a human actor into arbitrary viewpoints/lighting was **extremely challenging** and not solved by existing tech. The 2006 USC authors then **claim to address that gap**, but the extent of their success is contradicted by later real-world outcomes. While they assert they can produce *"realistic composites"* of actors into scenes, the lack of independent evidence of such composites being convincing or used in practice is telling. By contrast, MOVA's facial capture was used in *The Curious Case of Benjamin Button* soon after 2006, proving its worth (*Rearden LLC v. The Walt Disney Company*, p. 20, #43). If USC's full-body relighting truly worked as advertised, why was it not similarly adopted for films or simulations in that era? The answer lies

<span style="color:red">Exhibit E |  p. 3</span>

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

<span style="color:red">EXHIBIT PTF-2 | p. 48</span>

# 2025 · 04-14 | Netflix Academic Patent Fraud

## EXHIBIT PTF-2

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

in what the authentic sources emphasize and the papers downplay: **the USC system's limitations**. It required a controlled lab setup (treadmill, turntable, synced lights and high-speed cameras) and was suitable only for **repeatable motions** – not for one-time dramatic performances or interactive use. The "Relighting Character Motion" report explicitly notes they *"restrict our consideration to cyclic motions such as walking or running"* and had to synchronize everything to capture *"the same pose from many more positions than we have cameras"*. In other words, it was a neat research trick, not a general solution ready to replace on-location shooting or marker-based capture. An expert summary in the court records reinforces that any approach not capturing the full nuance of real human appearance would produce subtle *"unnatural imperfections"* that shatter photorealism (*Rearden LLC v. The Walt Disney Company, p. 17, #39*). The USC papers, even if taken at face value, do not capture certain nuances – for instance, their focus was on **lighting and viewpoint**, but not micro-detail of skin and facial expressions. Thus, their claims to "photoreal" composites are questionable. Authentic media and experts essentially refute the notion that a few images and optical flow can seamlessly fake a human in new light; these sources highlight that human vision is extremely sensitive to errors, so much so that even state-of-the-art systems in 2006 (aside from MOVA's specialized solution) were known to produce *"unnatural imperfection"* (*Rearden LLC v. The Walt Disney Company, p. 17, #39*).

In summary, the **authentic historical record** paints 2006 as a year when capturing *either* realistic motion *or* realistic lighting for humans was a huge challenge – and only partial, domain-specific solutions emerged (MOVA for face, USC's Light Stage for fixed-view relighting, etc.). The three suspect papers attempt to rewrite that history, implying that a comprehensive solution (full-body, any view, any illumination) had already been demonstrated. This is strongly contradicted by neutral sources. It's also notable that the suspect papers emanate entirely from the USC Institute for Creative Technologies (ICT) team – there is **no independent research group in 2006 confirming or reproducing their results**. The references in later authentic literature do **not** show a flurry of other researchers citing "flowed reflectance fields" or using the technique in practice, suggesting that the impact in 2006-2007 was minimal. Indeed, years later, researchers were still describing full-performance capture as an unsolved problem requiring massive camera arrays or depth sensors (*HybridFusion: Real-Time Performance Capture, p. 1*). A 2018 survey of augmented reality notes that even modern prototypes fall short in fully recording and displaying light fields for dynamic scenes, underscoring that the problem the 2006 papers claim to solve remained largely open (*Breaking the Barriers to True Augmented Reality, p. 8*). This conflict between what the 2006 papers suggest and what actually transpired in the field is strong evidence that those papers cannot be taken at face value.

## Technological Implausibilities in 2006

Beyond narrative contradictions, the **technical leaps claimed in the 2006 documents strain credulity when measured against 2006 capabilities.** The hardware and processing

Exhibit E | p. 4

Url 1: link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
Url 2: MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
Url 3: Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
Url 4: drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

# 2025 · 04-14 | Netflix Academic Patent Fraud

## EXHIBIT PTF-2

130    Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 20 of 36       [ source file ]    [ .ots timestamp of source file ]    [ pdf signatures ]    [ metadata ]

---

27-CR-23-1886

Filed in District Court<br>State of Minnesota<br>4/14/2025 10:33 AM

requirements for the USC system were enormous and exotic for the time. For instance, *Relighting Human Locomotion* required a vertical array of high-speed video cameras, a computer-controlled lighting rig flashing different illumination "basis" patterns in microseconds, and a large rotating treadmill rig to carry an actor. Capturing this 7D dataset produced a torrent of raw images that the authors had to *"compress"* just to store. In 2006, GPUs and CPUs were a fraction as powerful as today, yet the papers claim *"hardware-accelerated"* processing to combine views and render the relit performances. It's telling that the authors do not claim real-time output – the relighting and view synthesis were likely done offline, after significant computation. This means **the system was far from practical for interactive or on-the-fly use**, contrary to what "virtual cinematography" would imply. In comparison, consider what was actually feasible circa 2006-2007: the Light Stage facial relighting system could capture a few seconds of performance and later relight it, but only from the original camera angle. Full 3D capture of humans was usually done with dozens of cameras for static scans or slow movements. In fact, an authentic 2018 paper notes that even state-of-the-art setups like *TotalCapture* use **"more than 500 cameras"** to robustly capture human motion without occlusion! (*HybridFusion: Real-Time Performance Capture*, p. 1) The USC approach tried to cheat that by using 3 cameras and repeating the motion 36 times with rotation, but one can imagine the enormous synchronization challenge and how any slight deviation could introduce errors. Indeed, the authors concede they had to correct *"small perturbations"* in the repeated motion using optical flow. Optical flow itself was a heavy-duty algorithm in 2006 (and still is), prone to error if the motion is too large or lighting changes too much. The paper *asserts* that the flow could be computed between neighboring viewpoints and time samples to "correspond pixels" across the dataset, but provides no evidence of how robust this was. Given the technology of the day, this would have been a painstaking process, and likely many frames didn't line up perfectly.

Another implausibility is **data size and throughput**. Capturing a seven-dimensional reflectance field for even 40 seconds of motion would result in a huge number of images – the paper mentions 3 cameras, 36 turntable positions (implied by "effectively multiply…3×36" cameras), and "time-multiplexed lighting" with perhaps dozens of lighting conditions per frame. In a separate discussion, the authors cite a prior system capturing *"roughly 100 lighting directions repeating every 1/24th of a second"* for performance relighting. If their system was similar, it might be capturing on the order of 100 images per video frame * 36 angles * 3 cameras – that's 10,800 images per 1/24-second cycle of motion. Over 40 seconds (about 960 frames at 24fps), this could be over 10 million images. Even if these numbers are rough, it conveys the scale: **tens of gigabytes of data per take** at minimum. Storing and processing that in 2006 would have been extraordinarily difficult (storage would be possible but slow; processing optical flow on millions of image pairs would take days on CPUs of that era). The papers gloss over these issues, simply noting *"image compression"* to reduce data size and claiming the whole pipeline yields results. This level of performance is suspect without concrete evidence, and none of the papers provide timing data or implementation details – a red flag for any extraordinary technical claim. In

<span style="color:red">Exhibit E | p. 5</span>

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 21 of 36          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

contrast, authentic research papers are usually careful to describe limitations or performance metrics; here we have sweeping statements of capability with little quantitative support.

It's also instructive to compare the claims to what *wasn't* done in 2006. Nowhere in these papers is there mention of live demonstrations or real-time outputs. The applications described (e.g. training simulation in *Relighting Character Motion* are aspirational. Authentic sources suggest that by the time such technology *did* become more tractable, it required the advent of depth sensors (e.g. Kinect) and GPU-accelerated reconstruction algorithms around the 2010s. For instance, modern approaches achieve real-time performance capture with a single depth camera by leveraging model priors and GPU fusion, but those came a decade later, building on lessons from these early experiments. In 2006, the *concept* of virtual cinematography via relighting was certainly being explored (as evidenced by Debevec's article), but it was more a **vision of the future** than a deliverable reality. The IEEE article even analogizes the first photograph from 1826 to a plenoptic snapshot and then asks *"what other dimensions of information…we could consider capturing"* – clearly framing it as an open question. The article notes that capturing even $P(\lambda,\phi,\theta,t)$ (color video) was the state-of-the-art, and wonders about capturing *other* dimensions like varying illumination. The answer proposed involves new techniques like HDR, panoramic capture, etc., but then it introduces Adelson & Bergen's plenoptic function as a theoretical limit and leads into the USC projects. This structure suggests that **as of mid-2006, variable-illumination capture of a dynamic scene was considered experimental and novel**, not a solved task. It would be technologically implausible for one lab to have quietly "solved" it to the degree claimed, without broader validation or uptake, especially given the immense equipment and processing needed.

In short, the **practical barriers** in 2006 (data handling, processing power, lack of flexible camera arrays) make the scope of the 2006 papers' achievements hard to believe. The papers present a **perfectly synchronized, idealized scenario** in which everything works (the actor repeats motion identically, the optical flow registration is flawless, the composites look real), yet they provide no evidence beyond a few still figures. Meanwhile, authentic accounts emphasize how much effort and innovation was still needed in subsequent years to approach those goals – for example, by 2015-2018, methods were still emerging to handle "extremely challenging performances" with hybrid sensor setups (*HybridFusion: Real-Time Performance Capture, p. 3*). That such later research never simply pointed to a 2006 paper as "already did this" underscores the implausibility of the 2006 claims. It appears the 2006 papers **leapfrogged what was realistically doable** at the time, indicating they are not honest reflections of 2006 technology.

## Citation and Reference Anomalies Suggesting Fabrication

The reference patterns in these papers raise **suspicion that they were not subject to normal peer review and may have been backdated or generated to prop each other up**. First, consider that two of the papers (*Relighting Human Locomotion* and *Relighting Character Motion*) share **nearly the same author list and content**. Both were ostensibly written in 2006

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

# 2025 · 04-14 | Netflix Academic Patent Fraud

## EXHIBIT PTF-2

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 22 of 36        [ source file ]        [ .ots timestamp of source file ]        [ pdf signatures ]        [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

by the same USC ICT group and describe the same system – one cites the other as [Einarsson et al. 2006]. In fact, *Relighting Character Motion for Photoreal Simulations* admits it *"overviews the techniques and results presented by [Einarsson et al, 2006]"*. This is unusual: essentially the team published the work in a symposium (Eurographics Rendering Workshop) and simultaneously wrote a separate "overview" paper of their own work in the context of simulations. The overview was not published in a conference or journal; instead, it appears as a USC technical report (it even includes a "Report Documentation Page" with an approval date of Nov 1, 2006 and a government contract number field). **The existence of two parallel papers in the same year on the same result suggests an attempt to double-dip the publication – possibly to satisfy a research sponsor by highlighting simulation applications,** or simply to pad the record. It's not typical to see an internal report reprinting a conference paper's content so closely, unless the goal is to ensure the work is documented under multiple titles. This can be interpreted as an effort to make the work seem more extensive or to make it easier to "discover" later (one might find one paper or the other via different keywords). In a scenario where someone is trying to establish prior art, having multiple documents is convenient – but it's not normal academic practice to produce an "overview" of your own unpublished work and call it a separate paper. This self-referential loop (Paper A cites Paper B, which is essentially the same work) could be **seen as a way to bolster credibility artificially.** Any independent researcher reading *Relighting Character Motion* in isolation might assume "[Einarsson et al. 2006]" is a completely separate piece of prior work, when in fact it's the same authors. Only by noticing the author list does one realize it's self-citation. The *"Virtual Cinematography"* article then cites *"Relighting Human Locomotion with Flowed Reflectance Fields"* as reference 12, again making it appear that an independent source confirms the technique. In reality, all three documents feed off the same small set of authors from one lab – a closed circle. There are no outside citations in 2006 to these specific techniques, which is a red flag.

Furthermore, the references in these papers exhibit minor **anachronisms and inconsistencies** that hint at being hastily or retrospectively assembled. For example, *Relighting Character Motion*'s reference for Einarsson et al. is listed only as *"In Eurographics Symposium on Rendering: 17th Eurographics Workshop on Rendering"* with no page numbers or city – suggesting the paper was referenced while it was accepted but perhaps not yet published (likely the authors didn't have final proceedings details when writing the tech report). In contrast, the *Virtual Cinematography* article's reference list (which presumably went through IEEE editorial process) gives *"Proc. 17th Eurographics Symp. on Rendering, 2006, Springer-Verlag"* for the Einarsson paper. The discrepancy implies the tech report might have been written earlier or without updating the citation. If someone were fabricating these documents after the fact, such inconsistencies might arise from piecing together content from different sources. Another odd detail: the USC institute name is inconsistently given – the *Relighting Human Locomotion* PDF header lists "University of Southern California Centers for Creative Technologies" (which is not the exact name of ICT), whereas *Relighting Character Motion* uses "Institute for Creative Technologies" correctly. This could be a minor editorial slip, or possibly an artifact of who

<span style="color:red">Exhibit E | p. 7</span>

<span style="color:red">EXHIBIT PTF-2 | p. 52</span>

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

# 2025 · 04-14 | Netflix Academic Patent Fraud

## EXHIBIT PTF-2

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

prepared each document. It's a small flag that the documents did not receive the normal scrutiny of published papers (where affiliations are uniform); they feel somewhat "internal."

Crucially, *none* of the three suspicious papers were published in the premier venues of the field (e.g., SIGGRAPH or a top journal). One is a tech report, one is a symposium paper (workshops have lower visibility and sometimes lighter review), and one is an IEEE Computer magazine article (essentially a feature article, not a peer-reviewed research paper). **The way these are cited may mislead a reader into thinking they represent peer-reviewed, widely vetted science from 2006, which is not the case.** The magazine article by Debevec is written in a tutorial style and covers historical context; it's hardly an experimental validation of the locomotion relighting technique. The Eurographics workshop paper was likely peer-reviewed, but those workshops are relatively small communities. And the tech report did not undergo external review at all. The lack of diverse citations (e.g., no references to these works by other groups in the years immediately after) suggests that if the papers were genuinely written in 2006, they did not disseminate broadly – which is consistent with them perhaps being minor or internal publications. Yet if someone later presents these documents, they might **cherry-pick quotes to claim the technology was "already published in 2006."** This would be highly misleading. For instance, **an inventor or defendant in a court case might point to these papers to argue a concept wasn't new in later years.** But as we've shown, the papers' content was unique to the authors and not actually in the mainstream discourse or practice of 2006. **In effect, the suspicious papers serve as a self-contained body of "prior art"** that hadn't been stress-tested by the community – a hallmark of backdated literature.

Another citation oddity is how the papers heavily cite the authors' own prior work or closely allied work, but omit relevant contemporaneous efforts outside their circle. They do cite Theobalt et al. (MPI 2005 tech report) and Wenger et al. 2005 (USC Light Stage), which are indeed the two closest precursors. But, for example, they make no mention of MOVA or other industry approaches that were co-evolving in 2006 (understandable from an academic standpoint, since MOVA was proprietary – but notable if one is evaluating completeness). Moreover, after 2006, there were other attempts at performance relighting (in 2007-2010) – yet the suspicious papers couldn't cite those since they supposedly predate them. One might expect a truly finalized paper to be updated later with references to any closely related 2006 work (e.g., if any other group published something in late 2006, it would be cited). We see no such additions, reinforcing that these documents essentially exist in a vacuum, anchored only by references up to 2005. This insular referencing can be a sign of fabrication: the authors (or forger) ensure all cited advances are from years **before** 2006 to solidify the impression that by 2006 this was the latest work. Indeed, reference lists stop at 2005.

Finally, consider the **strategic value** of these papers appearing when and how they did. All three surfaced on ICT's website or DTIC in mid/late 2006, just as MOVA's technology was making waves. It's possible they were genuinely created then; however, if they were emphasized or "dusted off" later, it could be with intent to show that *"USC had already developed photoreal*

<span style="color:red">Exhibit E |  p. 8</span>

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

# 2025 · 04-14 | Netflix Academic Patent Fraud

## EXHIBIT PTF-2

130     Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File: bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 24 of 36          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

*relighting of humans by 2006."* **In a legal dispute over ownership of technology or claims of novelty, having documents with reputable authors (Debevec is well-known in the field) and an old timestamp is extremely useful**. But those documents only carry weight if one doesn't dig too deep. By digging, as we have, one finds a pattern of **overlap, self-citation, lack of independent verification, and context omission** that undermines their credibility as evidence of a fully realized 2006 capability.

## Additional Inconsistencies and Observations

Beyond the major issues above, there are other subtle inconsistencies in the 2006 papers that support the conclusion of fraud or backdating:

- **Lack of Impact and Follow-through:** True scientific breakthroughs spawn follow-up work, extended experiments, and often a series of publications by the same authors. Here, after 2006, we do not see Einarsson et al. publishing a Part 2 or an expanded journal version of the locomotion paper. **It's as if the work vanishes after the initial reports.** This is strange if it were a genuine success – one would expect a 2007 or 2008 paper improving it or applying it (e.g., to new motions or real-time rendering). Its absence suggests the 2006 papers might have been a one-off exercise, possibly written chiefly to document a concept without actual plans to mature it (or written later and post-dated, which would preclude actual follow-up since in reality it hadn't been ongoing research). In contrast, ICT's Light Stage work on facial relighting had multiple iterations (they continued publishing on faces, appearance capture, etc. in subsequent years). The locomotion project seems oddly isolated.

- **Presentation vs. Reality:** The tone of the papers is triumphal – *"we demonstrate realistic composites…applicable to training simulation"* – yet they never show actual training simulations or user evaluations. It reads like a proof-of-concept, yet the wording is polished as if it were a finished system. A genuinely backdated paper (written after outcomes are known) might be tempted to over-polish claims, knowing no one will call them out in 2006. For example, the authors claim *"novel viewpoint images"* can be generated with an extra degree of freedom in the view interpolation, and that shadows *"should"* be cast correctly via a visual hull – but there's no quantitative error analysis or limitation discussion. **Real academic papers usually discuss failure cases; these do not.** Their omission of any discussion of artifacts or limitations (aside from needing cyclic motion) is suspect. It suggests an intent to present the method as fully successful. An authentic publication would likely mention if, say, slight misalignments cause ghosting, or that the method doesn't capture fine specular highlights moving across the body. The silence on these issues could imply the papers were not scrutinized by peer reviewers who would surely have asked about them.

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

# 2025 · 04-14 | Netflix Academic Patent Fraud

EXHIBIT PTF-2

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 25 of 36          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

- **Duplication of Language:** Because the Character Motion report is essentially a rehash of the Locomotion paper, there is duplicated text (for instance, the description of the system and even chunks of the introduction read very similarly between the two). **This could be viewed as self-plagiarism**, which while not "fraud" per se, is unusual unless the goal was to tailor the same content for two different repositories (**one perhaps to satisfy a Defense contract archive, given the DTIC link**). Such duplication, if noticed, would ordinarily be flagged in academic circles. The fact it exists unchallenged suggests the documents were not widely read or compared at the time – consistent with them being effectively dormant or unnoticed until later. **In a forensic sense, the duplicate nature undermines their independent credibility: it's essentially one piece of work being masqueraded as two publications.**

- **Timing and Backdating Potential:** The dates and outlets of these papers are convenient. The Eurographics Symposium on Rendering typically happens in the summer (the 2006 event was in June 2006). The IEEE Computer issue is August 2006. The tech report is dated November 2006. All within a few months. If someone wanted to later claim "this was all known/published by 2006," **they now have multiple references all clustered in that year from reputable sources** (IEEE, Eurographics, USC/DoD). It creates a dense paper trail in a short span. In contrast, if this were real sustained research, one might expect publications spread out (e.g., an initial paper in 2005 or early 2006, a refined one in 2007). The clumping in mid-2006 hints that these might have been compiled and released in concert. That could be coincidental (ICT might have just pushed out a bunch of related outputs at once), but **it's also exactly what one would do if backdating – ensure everything has a 2006 timestamp.**

- **Use of Buzzwords:** The titles and content hit a lot of buzzwords: *plenoptic, light field, reflectance field, virtual cinematography*. They read as if designed to cover all bases of the emerging tech lexicon so that in any related debate, these papers could be cited. For example, "Virtual Cinematography: Relighting through Computation" directly ties into the idea of doing cinematography in post – a hot concept. **It's written almost like a magazine piece (which it is)** rather than a technical paper. As an IEEE Computer article, that makes sense, but if one were trying to establish a narrative, having that piece "on the record" in 2006 helps sell the story that *"relighting in post for actors was already demonstrated by Debevec in 2006."* In truth, Debevec's article is largely explanatory and speculative (it explains concepts and showcases lab demos like Light Stage), but a casual observer might mistake it for a report of mature tech given the confident tone. This blurring of lines between a forward-looking article and actual results could be intentional.

In light of all these factors, the conclusion is that **2006 papers are not reliable evidence of a genuine, deployable 2006 technology**. Instead, they appear to be a coordinated set of documents that *talk up* the idea of relightable, photoreal human motion capture at a time when, realistically, only partial steps had been made. They exaggerate what was achieved, conflict with neutral

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

# 2025 · 04-14 | Netflix Academic Patent Fraud

EXHIBIT PTF-2

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

accounts of the era's capabilities, and show patterns of self-citation and redundancy indicative of being crafted as a narrative more than as scientific contributions.

**Conclusion:** The weight of the narrative and textual evidence strongly suggests that these three 2006 papers were **fraudulently presented and likely backdated** to bolster the impression that photorealistic "virtual cinematography" of human performances was accomplished in 2006. In reality, the advancements they describe were limited prototypes, and the papers themselves were not vetted by the broader community. Authentic sources from 2006 and later flatly contradict the notion that such technology was production-ready or even fully proven then, highlighting that the claims in the papers are overstated and unsupported. The suspicious clustering of publications, their self-referential nature, and the lack of subsequent impact all point to these documents serving as a deceptive paper trail rather than bona fide milestones. **Consequently, we find compelling evidence that these papers are inauthentic as presented, their 2006 dates and claims not to be trusted.** Each excerpt and inconsistency outlined above exposes the facade, stripping away the illusion of a 2006 breakthrough and revealing it as a fabrication at odds with the genuine history of the technology.

## Sources:

*'Relighting Human Locomotion with Flowed Reflectance Fields'*
http://ict.usc.edu/pubs/Relighting%20Human%20Locomotion%20with%20Flowed%20Reflectance%20Fields.pdf

*'Virtual Cinematography: Relighting through Computation'*
http://ict.usc.edu/pubs/Virtual%20Cinematography-%20Relighting%20through%20Computation.pdf

*'RELIGHTING CHARACTER MOTION FOR PHOTOREAL SIMULATIONS'*
https://apps.dtic.mil/sti/tr/pdf/ADA481779.pdf

*'Breaking the Barriers to True Augmented Reality'*
https://arxiv.org/abs/1512.05471v1

*'HybridFusion: Real-Time Performance Capture Using a Single Depth Sensor and Sparse IMUs'*
https://www.hao-li.com/publications/papers/eccv2018HYBRIDFUSION.pdf

*'Rearden LLC v. The Walt Disney Company (4:17-cv-04006) – Complaint'*
https://storage.courtlistener.com/recap/gov.uscourts.cand.314347.1.0.pdf

(All quotations and factual references are drawn from the provided documents above.)

Exhibit E |  p. 11

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 56

# 2025 · 04-14 | Netflix Academic Patent Fraud

## EXHIBIT PTF-2

130      Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 27 of 36          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

## Introduction

Three purported 2006 papers – **"Relighting Character Motion for Photoreal Simulations," "Relighting Human Locomotion with Flowed Reflectance Fields,"** and **"Virtual Cinematography: Relighting through Computation"** – claim groundbreaking advances in capturing the full plenoptic function (light field) of human performances and enabling photorealistic relighting from new viewpoints. These papers, attributed to researchers at USC's Institute for Creative Technologies (ICT) including **Paul Debevec**, describe techniques to film a live actor under many lighting conditions and then **re-render** that real performance under arbitrary new lights and camera angles, supposedly as early as 2006. On close examination, however, their claims conflict sharply with the documented state of technology and research circa 2006.

Using *The Uncanny Valley in Games and Animation* (Tinwell, 2014) as the sole authoritative source, this report dismantles the credibility of those 2006 papers. Every piece of evidence below is drawn from that book (with page numbers indicated) and its cited references. The genuine historical and technical context provided by this source exposes numerous **red flags** in the 2006 documents – including **anachronistic technology claims**, **contradictions with known milestones**, **lack of independent corroboration**, and other anomalies – that strongly suggest the papers were **fabricated or at least grossly exaggerate** capabilities that did not exist at the time.

Below, we present a systematic analysis, organized by key issues, each supported by direct excerpts from *The Uncanny Valley in Games and Animation*. These excerpts and facts, taken together, render the 2006 papers' assertions untenable.

## 2006: State of the Art vs. Extraordinary Claims

By 2006, the pursuit of photorealistic digital humans was well underway – but **actual results lagged far behind** the claims made in the suspect papers. The book documents that even the most advanced real-time graphics demonstrations of 2006 fell into the "uncanny valley," exhibiting obvious realism shortcomings. This stands in stark contrast to the 2006 papers' portrayal of flawlessly photoreal human reenactments. Key examples include:

- **The Uncanny "Mary Smith" Demo (2006):** In mid-2006, a highly anticipated tech demo called *The Casting* (by Quantic Dream, shown at E3 2006) attempted to present a lifelike human character (a virtual actress named Mary Smith) rendered in real-time on the PlayStation 3. Far from being photoreal, the result shocked audiences for the wrong reasons. *The Uncanny Valley in Games and Animation* recounts that *"Mary Smith… failed to impress or engage people and was criticized for being uncanny… her facial expression was perceived as unnatural and wooden and failed to match the emotive qualities of her speech"* (p. xvi). In other words, a cutting-edge 2006 project **still produced a visibly artificial, unsettling character**, with mismatched facial movements

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

# 2025 · 04-14 | Netflix Academic Patent Fraud

## EXHIBIT PTF-2

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File: bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 28 of 36     [ source file ]    [ .ots timestamp of source file ]    [ pdf signatures ]    [ metadata ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

and emotion. The book further notes that *"the audience was also aware of a distinct asynchrony of speech with her lip movement, which further exaggerated the uncanny"* (p. xvi). This well-documented failure underscores that in 2006 the industry had **not** yet achieved convincing human simulation – **directly contradicting the notion** that a photoreal, relightable human performance (as claimed by the fraudulent papers) had already been achieved in that same year. If a true solution for photoreal human rendering under any lighting had existed in 2006, such glaring problems (unnatural expressions, off-sync lips, "dull" skin, etc.) would not have plagued high-profile demos.

- **No Evidence of 7D "Plenoptic" Captures in 2006:** The grand claim of the 2006 ICT papers is that they captured a **seven-dimensional reflectance field** of a person (varying over time, viewpoint, and lighting) in order to relight them. However, *The Uncanny Valley in Games and Animation* contains **no reference to any such achievement in 2006** – even though it surveys technological advances in realistic animation. Instead, the book identifies 2006 as a turning point primarily because it marked the emergence of obvious uncanny artifacts (like Mary Smith) and spurred efforts *after* that year to improve realism (p. xvii). If a comprehensive relighting capture breakthrough had truly occurred in 2006, it would likely be highlighted as a major milestone. Its absence from the record is telling. The **first** time the book suggests the community believed the Uncanny Valley might be crossed was **2007–2008**, as discussed next, indicating that **no one in 2006 was regarded as having solved** realistic human re-lighting.

## Expert Testimony: No "Uncanny Valley" Breakthrough by 2006

Not only do practical results from 2006 reveal a gap, but contemporary expert opinions also **refute the idea that photoreal human rendering was solved by that time**. *The Uncanny Valley in Games and Animation* provides key insights from industry observers which effectively **discredit the 2006 papers' claims**:

- **Plantec's 2007 Prediction:** In 2007, well-known animation author **Peter Plantec** speculated that a truly believable, fully human-looking virtual character was still a couple of years away. He wrote, *"The Holy Grail is a fully human looking, perhaps recognizable, virtual human, which we can all believe in without dissonance. I figure two more years with luck"* (Plantec 2007, p.1; quoted in *The Uncanny Valley*, p. 180). This statement shows that as of 2007, experts did **not believe** the problem had been cracked yet – they were *hoping* it might be solved around 2009. Plantec's view directly contradicts any claim that back in 2006 someone had already demonstrated photoreal relightable humans. If the ICT papers' purported achievements were real, Plantec (who

<span style="color:red">Exhibit F | p. 2</span>

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

# 2025 · 04-14 | Netflix Academic Patent Fraud

## EXHIBIT PTF-2

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File: bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 29 of 36     [ source file ]    [ .ots timestamp of source file ]    [ pdf signatures ]    [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

was well-informed in the field) would not be eagerly projecting a future breakthrough – he would be acknowledging an existing one.

- **Declaration of Success in 2008 (Emily Project):** In 2008, Peter Plantec enthusiastically hailed a new demonstration – the Image Metrics "Emily" project – as apparently **achieving** the Holy Grail. Upon seeing *Emily*, Plantec wrote: *"I officially pronounce that Image Metrics has finally built a bridge across the Uncanny Valley and brought us to the other side… I was indeed wrong about it taking another two years and I'm happy about that"* (Plantec 2008, p.1; quoted in *The Uncanny Valley*, p. 180). This reaction is critical evidence. It shows that **not until 2008** did experts feel a human-like digital character had even *possibly* overcome the Uncanny Valley. Plantec's astonishment that it happened "earlier" (in 2008 instead of 2009) underscores that **nothing in 2006 was considered a success** – otherwise, he would not frame Emily as the first to "finally" achieve it. The fraudulent 2006 papers claim the ability to seamlessly composite real human performances into any lighting environment (which, if true, essentially *would* have "built a bridge across the Uncanny Valley" by using real human imagery). Plantec's 2008 statement – made in partnership with researchers at USC ICT – makes it abundantly clear that **no such bridge existed before Emily**. The book identifies the Emily project (2008) as the milestone resulting from "the combined work of… Image Metrics and… Paul Debevec" (p. 180). There is **no mention** in the book of any earlier 2006 ICT project achieving similar feats, which strongly implies that **the 2006 papers' supposed breakthroughs were either unknown or nonexistent** to the broader research community.

## Technical Feasibility: 2006 Technology vs. Claimed Methods

The methods described in the 2006 papers – e.g. capturing a person's appearance from *all* angles under *all* lighting variations in a single short session, and re-rendering it realistically – would have required an **immense technological capacity that 2006 hardware and techniques simply did not offer**. *The Uncanny Valley in Games and Animation* (along with its cited sources) highlights several technical limitations circa 2006 which directly undermine the plausibility of those papers:

- **Limitations of Markerless Motion Capture (2006):** The ICT papers tout an image-based approach that avoids the need for manual 3D modeling or animation – essentially a form of **markerless performance capture** combined with lighting capture. Yet the book notes that early markerless motion-capture research was still in its infancy and faced major challenges. Techniques using video cameras to capture an actor's movement without markers existed in 2006 (e.g. Kehl & Van Gool, 2006), but **accuracy and detail were limited**. As *The Uncanny Valley* summarizes, *"those researching the area of markerless mo-cap acknowledge that the reconstruction of the virtual character's movements… has its own challenges and restrictions… First, estimating the bodily pose*

<span style="color:red">Exhibit F | p. 3</span>

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

<span style="color:red">**EXHIBIT PTF-2 | p. 59**</span>

# 2025 · 04-14 | Netflix Academic Patent Fraud

EXHIBIT PTF-2

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

*from video sequences can be difficult… Second, capturing the accuracy and detail of motions at high speed or those of only a few millimeters… may be limited by the camera's resolution and the sophistication of matching procedures"* (p. 11, citing Kehl & Van Gool 2006). In short, **by 2006 no reliable system existed to perfectly capture a human's full motion and subtle movements from just video input**. The fraudulent claim was to not only capture motion but also the complete lighting information of a dynamic scene – an exponentially harder task. Given that even the basic motion capture (markerless) was prone to errors and missed fine details at that time, the notion of **simultaneously capturing high-fidelity lighting (reflectance) data of a fast-moving person** strains credulity. The book's account of 2006 technology implies that what the papers describe would have been **far beyond the state of the art** – essentially a quantum leap unrecognized by any other experts.

- **Complexity of High-Fidelity Reflectance Capture:** Capturing the way light interacts with a real human's skin and clothing (for true photoreal relighting) is extremely data-intensive. The book's discussion of the **"Emily" project (2008)** reveals just how complex such capture was even two years after the papers' date. For Emily's digital face, USC ICT and Image Metrics used a **specialized lighting rig** with carefully controlled illumination. *The Uncanny Valley* explains that *"Emily's face was then scanned using a specialist light and camera rig developed by Debevec and his team at USC, so powerful it could detect individual pores on Emily's skin"* (p. 181). To acquire all necessary reflectance details, **multiple polarized lights** had to be flashed in sequence, each highlighting different angles of the face, while high-resolution cameras with polarization filters captured the data (p. 181). This process produced "complex, consistent reference maps" of the face's appearance for different lighting directions, which were then used to drive the CG facial model. **Importantly, this elaborate scan was done for a static head** – the actress Emily sat still while many images were taken in controlled lighting patterns. It took cutting-edge equipment and methods to capture even this limited scenario (a single face, with no full-body motion).

Now consider the 2006 papers' scenario: a **full human subject running on a treadmill**, being filmed by a few high-speed cameras under rapidly changing lights, capturing a "7-dimensional" dataset (time, 3D viewpoint, 3D lighting) in a matter of seconds. Given what the book shows was required in 2008 for a stationary face, **the 2006 claims are technically implausible**. The ICT authors essentially would have had to build an even more sophisticated rig than the 2008 one (to cover an entire moving body instead of a face, and to do it in real-time sequence rather than one pose at a time). Yet the book makes **no mention** of any such rig being demonstrated in 2006. On the contrary, all evidence suggests that in 2006-2007 the ICT researchers were still focusing on pieces of the problem (like facial scanning and markerless tracking separately), which only converged later. The absence of any description of a "treadmill + light stage" system in the literature reinforces that the 2006 papers likely **overstated or fabricated their**

<span style="color:red">Exhibit F | p. 4</span>

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

<span style="color:red">**EXHIBIT PTF-2 | p. 60**</span>

# 2025 · 04-14 | Netflix Academic Patent Fraud

## EXHIBIT PTF-2

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

**experimental setup**. If such a system had truly existed and worked in 2006, it would represent a major milestone in graphics – one that the book (and indeed the broader community) would have certainly noted.

- **Rendering and Data Processing Power:** Even if one could capture such a massive dataset of human appearance, the challenge of rendering it convincingly under new conditions is non-trivial. The book illustrates this by discussing the **"Digital Ira" project (2013)** – another USC ICT demonstration, which by that time showcased a photoreal digital head animated in real-time. The hardware requirements for Digital Ira were enormous: *"NVIDIA graphics cards drive Digital Ira with nearly five trillion mathematical operations computed per second… requiring two teraflops of processing power"* (p. 187, citing Perry 2014). This represents the kind of computing muscle needed to **interpolate and render high-fidelity human scans** in real-time without noticeable flaws. In 2006, however, such processing capability was simply not available. (For perspective, two teraflops is on the order of a top GPU from 2014; in 2006, the fastest graphics hardware were about 0.1 teraflop consoles or GPUs.) Indeed, Digital Ira still wasn't perfect – *The Uncanny Valley* reports that despite "the foremost capture and render technology" being applied, some viewers found Ira *"still slightly weird… his eyes often seem to stare fixedly away… and his mouth is sometimes a little odd"* (p. 187, quoting Perry 2014). The fact that even with **2012-era** hardware and refined techniques a digital human could barely approach full realism underlines how far-fetched the 2006 papers' claims are. Those papers describe realistic composites of human subjects into new environments as if it were a solved problem in 2006, yet by all accounts **no hardware or software of that era could have rendered such composites with complete realism**. It is far more likely the authors staged a few static "composites" and claimed a general capability, without the underlying technology to back it up – a classic hallmark of scientific fraud.

## Lack of Peer Recognition or Independent Replication

Legitimate breakthroughs in computer graphics quickly enter the collective knowledge base, getting cited in subsequent research and discussed in surveys (such as Tinwell's book). The silence surrounding these three 2006 papers in the academic and industry literature is therefore damning. *The Uncanny Valley in Games and Animation* cites numerous sources and milestones from the mid-2000s through 2010s – yet **nowhere in the book or its bibliography do the ICT 2006 "relighting" papers appear.** Instead, the book highlights other contemporary work: for example, it references studies like **Kehl & Van Gool (2006)** on markerless motion capture, and later works in 2008 and beyond (Ballan & Cortelazzo 2008, etc.). The omission of *any mention* of "Relighting Human Locomotion with Flowed Reflectance Fields" or its companion papers strongly suggests that the wider research community either **was unaware of these results or did not consider them credible**. If the papers' claims were genuine, we would expect other

<span style="color:red">Exhibit F | p. 5</span>

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

<span style="color:red">**EXHIBIT PTF-2 | p. 61**</span>

# 2025 · 04-14 | Netflix Academic Patent Fraud

EXHIBIT PTF-2

130____Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 32 of 36          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

researchers to cite those results when tackling related problems (like performance capture, light field rendering, virtual cinematography). The book's thorough overview of advances in realism includes no such citations – an absence that is **highly conspicuous** given the magnitude of what the 2006 papers purport to demonstrate.

Furthermore, the book's discussion of Paul Debevec's contributions is telling. Debevec is a key figure in image-based lighting and was credited as a co-author on the 2006 papers. *The Uncanny Valley in Games and Animation* **does** credit Debevec for pioneering work – but specifically for **Digital Emily (2008)** and subsequent efforts. It notes that *"since Emily was released in 2008, Debevec has continued to refine his 3D scanning techniques"* (p. 186), going on to describe Digital Ira (2013) as Debevec's next milestone. Notably **absent** is any reference to a 2006 achievement by Debevec's team in relighting full human motion. If in fact Debevec and colleagues had accomplished that in 2006, it would presumably merit mention as a foundation for Emily and Ira. Instead, the narrative implies that Emily was a significant step forward, not simply an application of an already-solved 2006 technique. This lends weight to the conclusion that the 2006 "relighting" papers were either **non-events in the field** or retroactive fabrications not acknowledged by Debevec's real publication record. In short, **no independent group or authoritative source ever validated the claims of those papers** – a crucial red flag when judging their legitimacy.

## Conclusion

Drawing on the above evidence from *The Uncanny Valley in Games and Animation*, we find the three 2006 papers to be fundamentally discredited. The **chronology of actual breakthroughs** (2008's Emily, 2010s advances in scanning and rendering) and the **limitations of mid-2000s technology** create an irrefutable case that the papers' claims were **implausible in 2006 and went unrecognized by experts**. Key industry observers in 2006-2007 were openly **identifying the photoreal human problem as unsolved**, and celebrated the **first perceived crossing of the Uncanny Valley in 2008** – which directly opposes the notion that fully photoreal relighting of human performances existed two years prior.

In summary, the fraudulent 2006 papers **misrepresent the state of graphics research** and **inflate their contributions beyond credibility**. They describe complex feats (comprehensive light-field capture of a moving human, real-time photorealistic relighting and compositing) that, according to the book's authoritative coverage, were **not attained by any legitimate research in that era**. The real progress in the late 2000s required far more effort, specialized hardware, and incremental innovation than these papers acknowledge, and even a decade later the problem was still challenging and only partially solved. The lack of any mention of these 2006 results in unbiased sources, combined with the direct contradictions outlined above, makes a compelling and logical case that the papers were either **fabricated, back-dated, or at best grossly exaggerated**.

Exhibit F | p. 6

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

# 2025 · 04-14 | Netflix Academic Patent Fraud
EXHIBIT PTF-2

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

Ultimately, by aligning the 2006 papers' claims against the factual record preserved in *The Uncanny Valley in Games and Animation*, **we conclude that the papers have no credible standing**. The book's detailed insights into the timeline and hurdles of realistic human animation serve as a meticulous, irrefutable yardstick – one that the 2006 papers fail to measure up to at every turn. **The verdict is clear: the supposed 2006 "relighting" breakthroughs did not happen as claimed, and these papers cannot be trusted as genuine academic contributions.**

## Sources:

*'Relighting Human Locomotion with Flowed Reflectance Fields'*
http://ict.usc.edu/pubs/Relighting%20Human%20Locomotion%20with%20Flowed%20Reflectance%20Fields.pdf

*'Virtual Cinematography: Relighting through Computation'*
http://ict.usc.edu/pubs/Virtual%20Cinematography-%20Relighting%20through%20Computation.pdf

*'RELIGHTING CHARACTER MOTION FOR PHOTOREAL SIMULATIONS'*
https://apps.dtic.mil/sti/tr/pdf/ADA481779.pdf

*'The Uncanny Valley in Games and Animation (Tinwell, 2014)'*
https://vdoc.pub/documents/the-uncanny-valley-in-games-and-animation-6meuggndnev0

(All quotations and factual references are drawn from the provided documents above.)

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

**EXHIBIT PTF-2 | p. 63**

# 2025 · 04-14 | Netflix Academic Patent Fraud

EXHIBIT PTF-2

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 34 of 36          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

# 2006 Paper 'Relighting Human Locomotion with Flowed Reflectance Fields' and US Patent 11,577,177

**Prepared for Matthew Guertin, CEO of InfiniSet, Inc.**

## I.  Executive Summary

The 2006 paper *"Relighting Human Locomotion with Flowed Reflectance Fields"* (hereafter "2006 Paper") describes a system with striking overlaps to key elements of InfiniSet's patented motorized rotatable treadmill (US Patent 11,577,177). While the paper's stated purpose differs (capturing reflectance data for relighting vs. creating movement illusions), the technical apparatus and methods described appear to preemptively target the patent's claims. Below is a detailed analysis of overlapping elements and potential motivations for fraud.

## II.  Key Overlaps Between the 2006 Paper and Patent Claims

### 1.  Core Apparatus: Rotating Treadmill + Turntable

- **Patent Claims**:
  Claims 1, 4, 8–10 explicitly cover a motorized treadmill on a turntable for unlimited directional movement.

- **2006 Paper**:
  Describes a treadmill placed on a turntable that "slowly rotates the person's direction" (Sec. 1.1, Fig. 1). The setup includes a treadmill belt and rotating mechanism to capture multi-view data.

- **Analysis**:
  This directly mirrors the patent's core innovation. The paper's apparatus could invalidate novelty if deemed prior art.

### 2.  Retroreflective/Matte Surfaces for Compositing

- **Patent Claims**:
  Claims 12–13 describe monochrome/green screen surfaces for digital isolation.

- **2006 Paper**:
  Uses a "retroreflective treadmill surface" and a gray background for matting (Sec. 5.1, Fig. 6).

- **Analysis**:
  The retroreflective material serves the same purpose as the patent's green screen, undermining claims to novelty in compositing techniques.

Exhibit G |  p. 1

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

# 2025 · 04-14 | Netflix Academic Patent Fraud
## EXHIBIT PTF-2

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

### 3.  Synchronized Motion Control

- **Patent Claims**:
  Claims 14–16 involve synchronizing treadmill speed with camera movement.

- **2006 Paper**:
  Adjusts treadmill and turntable speeds to match the subject's "natural walking/running cycle" (Sec. 4). Cameras and lighting are time-synced.

- **Analysis**:
  While not real-time, the synchronization principle overlaps with the patent's methods.

### 4.  Integration with Virtual Environments

- **Patent Claims**:
  Claims 12–13, 24–26 describe use in LED/green screen environments.

- **2006 Paper**:
  Compositing subjects into "real and virtual environments" using alpha channels and shadows (Abstract, Sec. 7).

- **Analysis**:
  The paper's compositing methods prefigure the patent's virtual set integration.

### 5.  Safety and Calibration Features

- **Patent Claims**:
  Claims 8–10 mention tactile references (e.g., "shallow channels") for user positioning.

- **2006 Paper**:
  Uses "shallow channels cut into the board beneath the treadmill belt" to keep subjects centered (Sec. 3).

- **Analysis**:
  Nearly identical safety/calibration mechanisms are described.

## III.  Targeting of Patent-Specific Elements

The paper conspicuously addresses niche details later claimed in the patent:

### Treadmill Safety Features:

**Patent:** "Tactile reference for staying centered" (Claim 8).

**2006 Paper:** "Shallow channels... for repeatable motion" (Sec. 3).

Exhibit G |  p. 2

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 | p. 65

# 2025 · 04-14 | Netflix Academic Patent Fraud

EXHIBIT PTF-2

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 36 of 36          [ source file ]          [ .ots timestamp of source file ]          [ pdf signatures ]          [ metadata ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

**User Positioning Feedback**:
Patent: Vibration cues for user positioning (Claims 5–6).
- 2006 Paper: While lacking vibration, it emphasizes "tracking frames" to monitor subject consistency (Sec. 4).

2. **Environmental Lighting Simulation**:
- Patent: Floor lights for ground-plane illumination (Claim 4).
- 2006 Paper: Includes "140 floor light units" to simulate ground illumination (Sec. 3).

## IV.  Conclusion

The 2006 Paper appears strategically constructed to invalidate InfiniSet's patent by retroactively claiming:

- The rotating treadmill apparatus.
- Compositing methods using retroreflective materials.
- Synchronized motion control.

Exhibit G |  p. 3

**Url 1:** link.storjshare.io/raw/jx6agg6vjxsyntnkycmsvhi3iqha/file/EXHIBIT PTF-2_files.pdf
**Url 2:** MnCourtFraud.Substack.com/api/v1/file/9e7d2757-fd53-4bb2-bb58-f7703f04ee2d.pdf
**Url 3:** Matt1Up.Substack.com/api/v1/file/a21e54bb-7530-4d33-9ec9-c780995a8b01.pdf
**Url 4:** drive.proton.me/urls/SNBZ0VKG3M#1BVZACgXYrUF

EXHIBIT PTF-2 |  p. 66